[Civil No. 2273.  Filed November 3, 1924.]

[229 Pac. 929.]

# ARCHIE L. BREWSTER and JOHN W. SEARGEANT, Appellants, v. SALT RIVER VALLEY WATER USERS' ASSOCIATION, a Corporation, and CARRICK & MANGHAM AGUA FRIA LANDS & IRRIGATION COMPANY, a Corporation, Appellees.

1. WATERS AND WATERCOURSES—OFFICERS OF WATER USERS' ASSOCIATION HELD AUTHORIZED TO EXECUTE CONTRACT FOR DRAINAGE OF WASTE WATERS.—Charter of water users' association, providing that board of governors shall have power to make contracts in name of association necessary and proper to conduct affairs and carry on business of association, etc., *held* to authorize such board to execute contract with irrigation company, whereby latter is to draw waste waters from association's land and use it to reclaim adjacent lands.

2. WATERS AND WATERCOURSES—CONTRACT OF WATER USERS' ASSOCIATION AUTHORIZING IRRIGATION COMPANY TO DRAIN WASTE WATERS AND RECLAIM ADJACENT LANDS, HELD NOT ULTRA VIRES.—Contract entered into by water users' association whereby irrigation company is to drain waste waters from association's lands, and use it to reclaim adjacent lands, *held* not ultra vires, since association's charter does not provide for disposition of drainage waters, and its conservation is not one of the "objects" of the association, but disposition of such waters is left to discretion of association.

3. WATERS AND WATERCOURSES—CONTRACT AUTHORIZING DRAINAGE OF WASTE WATERS HELD NOT "SALE" OF SUCH WATERS.—Contract by which water users' association authorized irrigation company to drain waste waters from association's lands, and use it in reclaiming adjacent lands, *held* not a "sale" of such water in sense that chattels are sold.

4. WATERS AND WATERCOURSES—ARTIFICIAL WATER NOT SUBJECT TO APPROPRIATION.—Drainage waters put into ground by means of artificial irrigation are not subject to appropriation, under Civil Code of 1913, paragraphs 5337, 5344, and Laws of 1921, chapter 64, section 1, and person recovering such waters has legal right to dispose of them by sale or otherwise.

5. WATERS AND WATERCOURSES—WATER USERS' ASSOCIATION HELD AUTHORIZED BY CHARTER TO DISPOSE OF WASTE WATERS TO NON-

SHAREHOLDERS.—Water users' association having power to drain lands of project that are water-logged necessarily has right to dispose of water as incident thereto, and contract permitting irrigation company to apply such waters to irrigation of land outside of project was not beyond association's power, especially in view of its charter providing that board of governors shall each year fix charge to be paid for delivery of water to lands, owners of which are not shareholders.

6. WATERS AND WATERCOURSES—DISPOSITION OF POWER BY WATER USERS' ASSOCIATION NOT ENJOINED FOR ANTICIPATED INSUFFICIENCY OF POWER TO SUPPLY ASSOCIATION'S NEEDS.—Shareholders of water users' association are not entitled to injunctive relief against contract of association furnishing electric power to irrigation company to operate wells and pumps to drain waste waters on project, on ground that association may not be able to get power as they need it, or be able to care for other contracts to deliver power, there being time enough to apply to court when anticipated wrong is more imminent or actually occurring.

7. WATERS AND WATERCOURSES—THAT GRANT OF WASTE WATERS FLOWING TO ENDS OF CANALS, ETC., WILL INDUCE EMPLOYEES TO BE EXTRAVAGANT IN WASTING IT, NOT GROUND FOR INJUNCTIVE RELIEF UNTIL EXTRAVAGANCE OCCURS. — Shareholders of water users' association *held* not entitled to injunctive relief against contract granting irrigation company waste water that may flow to ends of canals, laterals, ditches or boundaries of project, on ground that such contract would encourage waste of water by authorities and employees of association, since if any extravagance in wasting waters should occur, remedy by injunction would still be open.

8. WATERS AND WATERCOURSES — WATER USERS' ASSOCIATION MAY DISPOSE OF WASTE WATERS ON WATER-LOGGED LAND UNLESS INVASION OF RIGHTS OF SHAREHOLDERS RESULTS. — Shareholders of water users' association *held* not entitled to injunctive relief against contract for irrigation company to drain water-logged lands of association, on ground that each shareholder is owner of water forming in his land from irrigation, since, as member of association each shareholder is bound to surrender ownership of water when drainage thereof is for best interest of all, and right to drain water being found, matters of detail in disposing thereof is within discretion of association, unless clearly shown to invade some right of shareholders.

---

See (1) 40 **Cyc.**, p. 826 (Anno.).  (2) 40 **Cyc.**, p. 826 (Anno.). (3) 40 **Cyc.**, p. 826 (Anno.).  (4) 40 **Cyc.**, p. 704.  (5) 40 **Cyc.**, p. 826 (Anno.).  (6) 40 **Cyc.**, p. 826 (Anno.).  (7) 40 **Cyc.**, p. 817.  (8) 40 **Cyc.**, p. 817.

APPEAL from a judgment of the Superior Court of the County of Maricopa. F. C. Struckmeyer, Judge. Affirmed.

Messrs. Baughn & Walton, for Appellants.

Messrs. Kibbey, Bennett, Gust & Smith, for Appellee Salt River Valley Water Users' Association.

Messrs. Alexander & Christy and Mr. Hess Seaman, for Appellee Carrick & Mangham Agua Fria Lands & Irrigation Company.

ROSS, J.—Throughout this opinion we shall refer to the Salt River Valley Water Users' Association as the Association, and to the Carrick & Mangham Agua Fria Lands & Irrigation Company as the Company. This action has for its object the restraining of the Association from proceeding in the execution of a contract entered into by it with the Company on August 25, 1921, upon the general grounds that the contract is *ultra vires* the powers of the Association; that the board of governors of the Association, through whom the contract was made, could not make the contract without authority of its stockholders; and that its execution would irreparably injure plaintiffs both as stockholders of the Association and as individual land owners.

The defendants, in separate answers, demurred to the complaint, on the ground that it showed upon its face a misjoinder of causes of action, in that the plaintiffs were suing as shareholders of the Association for a wrong committed against them as such, and also for alleged wrongs to them as individual land owners. They also demurred generally upon the ground that the complaint did not state facts sufficient to constitute a cause of action.

It was the latter demurrer that was sustained by the lower court, and, the plaintiffs refusing and failing to amend within the time allowed by the court, judgment was entered dismissing the complaint. The appeal is from such judgment.

The demurrer admitting everything that was well pleaded, it becomes necessary for us to look into the complaint with a view of determining whether the facts therein set forth stated a cause of action. The contract, which is made an exhibit to the complaint, shows upon its face that it was entered into for a twofold purpose: (1) To unwater certain water-logged lands of the Salt River project; and (2) to utilize such waters to reclaim lands adjacent to but outside of said project, and to accomplish these purposes at as little cost and expense as possible to both the contracting parties, especially the Association. These purposes are very plainly and concisely set forth in the preamble to the contract which we here quote:

"Whereas there lies within the boundaries of the so-called Salt River project, in Maricopa county, state of Arizona, a large area of land (hereinafter in paragraph 20 more particularly described) which has become, to a large and injurious extent, saturated with water and which it is desirable for the best interests of the association and the settlers and land owners within said project to have drained and unwatered; and

"Whereas, there lies in close proximity to the lands included within said project an area of land of approximately 35,000 acres which is without irrigation and which it is proposed by the company to irrigate with water pumped from the lands within said project and from waste waters purchased from the association; and

"Whereas, it is proposed to form said 35,000 acre tract into an irrigation district under the laws of the state of Arizona to which district this contract may be assigned and to irrigate said tract through

the medium of said irrigation district and to meet the cost of putting said waters on the lands of said irrigation district and of such irrigation by the sale of irrigation district bonds; and

"Whereas, in order to insure the payment of said bonds and the irrigation of said lands within said irrigation or conservancy district, it is necessary that said company and said irrigation district be assured of an adequate supply of water."

The Company in executing said contract was acting in behalf of the owners of the 35,000 acres of land proposed to be reclaimed, who, as we understand it, at the time were or since have become organized into an irrigation district, as provided by the laws of this state. We do not deem the details as to the manner of carrying out and making effective the object of the contract essential to a consideration of the points made, and for that reason do not set it out in full. Shortly, the plan as outlined by the contract may be stated to be as follows: The Association, so far as it can, gives or grants to the Company the right to enter on 48,960 acres of the saturated or water-logged lands of the Salt River project, with the privilege of installing at its own expense as many pumps as it wants, or as may be needed, for the purpose of pumping such water down to a level not deeper than fifty feet, without the consent of the Association, and with the duty imposed and assumed to dewater such area by pumping therefrom annually a minimum of 70,000 acre-feet.

It sells, or agrees to sell, to the Company all pumps, wells, equipment, owned by it and located on said 48,960 acres, at the cost of a like installation at the time of purchase. The Company agrees to install upon said area 50 wells, including the ones bought from the Association, and more if needed to remove the minimum of 70,000 acre-feet annually,

and to build all needed canals, ditches, and other works for carrying out the contract, under plans and specifications approved by the Association. Like privilege of pumping another water-logged area of 16,320 acres is conditionally given the Company, providing it should need, for beneficial use, more water than it can obtain from the larger area, or, if the Association should find it necessary to pump water for drainage purposes from said smaller area, the Company agrees to buy not to exceed 15,000 acre-feet per annum, and pay therefor, as well also for any waste water from said area, 75 cents per acre-foot. It is agreed the Company may have all the pumped and waste waters from the 48,960 acres that may flow to the ends of the canals, laterals, or ditches of the Association, or the boundaries of the Salt River project. The Association agrees to furnish the Company electric power to operate its wells and other works for the first ten years, at three-fourths of a cent per K. W. H. if available from its own power plants, and at cost if obtained from other sources, and the next twenty years at actual cost (meaning the cost of production and delivery, interest on investment, operation, maintenance and allowance for depreciation), and thereafter at the fair market value of such power.

For the water it is to get, and the pumps, wells and equipment, and the privileges granted, the Company agrees to advance or pay the Association a sum not to exceed $600,000, unless the purchase from the Association exceed $300,000, in which case the sum to be advanced shall be the costs of such equipment plus $300,000, the last sum to be used to install a 5,000 H. P. capacity steam electric plant and to be repaid the Company by the Association in furnishing power and water to that amount with interest at seven per cent.

The contract is "for the term of ninety-nine (99) years, the object of such operation being to pump and remove water from the area of land described in said paragraph 20 (48,960-acre tract) and to use said water to irrigate the said lands within the boundaries of the said irrigation district" (Company lands).

If we have omitted to state any detail that counsel may think important, it is not intentional. We do not pretend to give more than a general statement of its contents, but feel it is comprehensive enough to cover the questions presented.

The question of the Association's power to make the contract is at the threshhold of all others. Originally the Association was organized by the land owners of the Salt River project to aid them to provide an adequate and dependable water supply for the irrigation of their lands, and as an agency to co-operate with the national government in acquiring reservoirs and dam sites, rights of way, ditches and canals, and in the planning and construction of their irrigation plant. After the project was completed and fully tested out as a successful going concern under the supervision and control of the national government, and, presumably after the federal authorities had satisfied themselves of the competency of the farmers holding lands in the project to manage and control it, it was in September, 1917, turned over to the Association, in whose possession and control it has ever since been. While the main object of the Association, as disclosed by its charter, was irrigation, the possibilities of hydroelectric power as a by-product was also provided for in the charter, and from being originally an incidental economy this latter feature has developed into a great source of financial profit to the Association and its stockholders. In July, 1913, doubtless

that it might be certain of its right to act, its charter was amended, giving the Association authority to create, transmit, use, sell and dispose of power not only for its own purposes or objects, but for any other useful purpose and for profit.

The Association's right and power to enter into contracts with irrigation and electrical districts outside of the original project, and to furnish water and power thereto, while not directly passed upon by this court, has been recognized in at least two cases. *In re Auxiliary Eastern Canal Irr. Dist.,* 24 Ariz. 163, 207 Pac. 614; *Brown* v. *Electrical Dist. No. 2,* 26 Ariz. 181, 223 Pac. 1068. That the plant has grown and expanded and new, large, and important improvements thereto have been necessary, is evidenced by the bond issues whose validity has been questioned and passed upon by this court. *Orme* v. *Salt River Valley Water Users' Assn.,* 25 Ariz. 324, 217 Pac. 935; *Bethune* v. *Salt River Valley Water Users' Assn.,* 26 Ariz. 525, 227 Pac. 989. We recite the history of the Association's development as disclosed by the litigation that has reached this court, not only to present the physical fact of growth and expansion, but the necessity of amending as also liberally construing its charter, so as not to impede or hinder such growth and expansion.

The question we have here, at least so far as the Association is concerned, is not one of irrigation or of hydroelectric power. It is not a question of too little water and how to get more, but of too much water and how to get rid of it; it is a question of drainage. Owing to the abundant use of water for irrigation and its continuous application, and the natural formation of the country, much of the lands in the Salt River project had become so fully saturated with water as to be nonproductive, something that evidently was not contemplated or ex-

pected originally as it was not provided for in the Association's charter. However, the situation became so serious in September, 1918, that the shareholders of the Association voted a charge of $2.70 per acre against their lands, and used the proceeds to install a pumping system for drainage. Wells were sunk and pumps installed over a considerable area of the project at the expense of the Association, and these pumps were maintained and operated at its expense for the primary purpose of unwatering the water-logged areas. Had this not been done a condition might to-day exist in this valley such as the Secretary of Agriculture in his 1909 report (page 97) described as existing in other irrigated areas of the country:

"For years it has been known that some irrigated fields easily become swamps, while the productiveness of others is ruined by the accumulation of injurious alkali. The lands which are most easily irrigated by water from the mountain streams, and which are surprisingly productive when first reclaimed from a desert condition, not infrequently become noisome bogs or alkaline wastes after a few years of cultivation under copious irrigation. This is true of a portion of every irrigated valley in the West. Utah contains not less than 150,000 acres of such land: Colorado, 75,000; California, 100,000; Nevada, 250,000; Wyoming, 50,000; Montana, 60,000; Idaho, 40,000—all having been once cultivated and still having valuable water rights. These are conservative estimates, showing the gravity of the situation, and when considered from the point of the owners particularly emphasize the importance of using preventive as well as curative measures in the treatment of saturated lands which are under irrigation."

Thus the Association, being confronted with another problem of a very diverse character from previous ones, but quite as insistent, was compelled to adopt means for its solution. The burden of in-

stallation, maintenance and replacement of a pumping system of the magnitude necessary obviously was not only large but continuous, and would grow with time. It was a condition and not a theory the Association faced. The question is, Did it have the right and power under its charter and the general laws to enter into such contract arrangement with the Company? It is the contention of appellants it did not. In their complaint they enumerate their reasons for asking the execution of contract be by the court forbidden, as follows:

First. Lack of authority in the board of governors to make the contract.

Second. That part of the contract disposing of or attempting to dispose of the assets of the Association, to wit, the pumps and wells, the pumped and waste waters all being essential to the discharge of its duties and obligations to its stockholders, is *ultra vires* its powers.

Third. That the Association and its officers have no authority to dispose of the waters it has impounded or developed, either by sale or otherwise, to persons outside the Salt River project, or to persons not stockholders of the association; that the Association's authority in that regard is limited to a division of such waters to the legal and primary rights of the shareholders.

Fourth. That the contract to furnish power to the Company binds the Association to sell said power irrespective of the needs of plaintiffs, and other shareholders, or any prior contract it may have made for the disposition of its electric power now being generated, or that may hereafter be generated.

Fifth. That the grant or release of waste water that may flow to the ends of the canals, laterals or ditches of the Association or to the boundaries of the Salt River project is a present and constant invitation to the authorities and employees of the

Association to increase the amount of the so-called waste water; and

Sixth. That the Association has no right to the waters under the lands of plaintiffs and other land owners similarly situated; that such waters belong to the land owners both before and after they are extracted, and can be disposed of only by such owners or with their consent; that if the contract is carried out, and the water-level under their lands lowered, growing crops will be deprived of moisture by capillary attraction, and thereby damaged; that their trees, foliage and grass will not receive proper moisture; that the pumped water is a very necessary and proper source from which to supplement the impounded water for irrigation; that the surrender of all such water, in case of prolonged drought resulting in the exhaustion of all the impounded water, would or might occasion to them irreparable damage, and that the contract proposes to take from the lands only that portion of the waters for the use of the Company as is sufficiently free from alkali and other deleterious substances as makes it fit for beneficial use, thereby leaving under plaintiffs' lands all alkaloid waters increasing the proportion of alkali thereunder.

These objections are the foundation of appellants' assignments of error, and will be considered in the order given.

First. It is urged in the complaint against the validity of the contract that it was not submitted to the council or the shareholders for ratification or approval, and, without such ratification or approval or an amendment to the charter granting to the board of governors power and authority to make the contract, they had no such power. The point is given but slight notice in appellants' brief. The exercise of the corporate powers of the Association and the management of its affairs is vested in a

27 Ariz.—3

council, a board of governors, one or more local boards of water commissioners, and a president, vice-president, treasurer, secretary and such other officers and agents as shall or may be from time to time created and established by the council. Section 1, article 3 of the charter. Under the charter it would seem the functions of the council are largely legislative, while those of the board of governors are very similar to the duties and powers of boards of directors of corporations. By section 8 of article 8 it is provided:

"The board of governors shall have the administration of the corporate affairs and business of the association, and shall manage and conduct the same subject to all the provisions of these articles and of the by-laws."

Section 10 of the same article provides that the board of governors—

" . . . shall have the power to prosecute, defend and compromise all lawsuits; to make contracts in the name of the association necessary and proper for the conduct of the affairs and the carrying on of the business of the association subject to all limitations and regulations prescribed by these articles or the by-laws."

The limitation upon the power of the board of governors to contract debts is found in section 8 of article 13, as follows:

"Except for the ordinary operation, maintenance and repair, no work shall be undertaken, purchase made, or indebtedness incurred or be authorized during any one year whereof the cost or amount thereof shall exceed $100,000.00, until it shall have first been ratified by at least a majority of the votes cast at a regular election, or at an election to be called for that purpose."

Under these provisions of the charter it would seem that the authority of the board of governors

to execute contracts generally for the Association, in carrying on the ordinary operation of its business and for the maintenance and repair thereof, is ample.

Second. Is the contract *ultra vires* the Association's powers? By an amendment to the charter, adopted October 28, 1919, the Association is given power "to construct, install, operate, and maintain pumps, ditches, conduits, and other drainage works for draining any or all of the lands receiving water through the irrigation works of the Association." While appellants concede the Association itself under such amendment can lawfully provide a system of drainage for lands in the project, and can delegate that power to another when strictly confined to unwatering lands, they strenuously contend that when it undertakes to assume ownership and right to convey waters it exceeds its powers. So the contest is not about the power of the Association to drain lands, that being conceded, nor about its right to delegate that duty to another, it is principally over the disposition of the water after it is pumped out of the ground.

It should be remembered this drainage water is very different in quality and character from the impounded water. The latter is the life-giving liquid, and it was to save it that the Association was formed. The former is life destroying and the Association must get rid of it or suffer great loss, or perhaps perish. It is the impounded waters at Roosevelt and Mormon flats that the charter provides shall be distributed and furnished to the lands of the holders of shares of said Association, and not drainage water, and if the contract in question undertook to dispose of the impounded waters to strangers to the project we would have a very different proposition. The "stored and developed

waters'' referred to in section 6, article 5, which is to be apportioned among the owners of land for irrigation thereof is a very different article than the water pumped out of the ground for drainage purposes. The charter does not provide for the disposition of the drainage water. The power and duty to devise means of ridding the lands of the underground lake formed by reason of the application thereto of the impounded water being vested in the Association, in the absence of any direction as to what disposition should be made of it, it would seem should be left to the discretion of the Association. Section 1 of article 4 contains authority for the Association to enter into the contract in question, for there it is said:

"The objects for which the Association is organized and the general nature of the business to be transacted by it shall be and are: . . . To have and exercise all the powers, and do all and everything necessary, suitable, convenient or proper for the accomplishment of any of the purposes, or the attainment of any one or more of the objects herein enumerated, or incidental to the powers herein named, or which shall at any time appear conducive or expedient for the protection or benefit of the association or its members as shareholders therein.''

If the pumped water were wholly bad, not fit for irrigation either alone or when mixed with the river water, it would be treated as a pest, and disposed of much in the same way. And, indeed, from the absence of any provision in the charter restricting its disposition, it was doubtless concluded that it was of so little value as not to require any specific mention. It is contended, however, that the drainage water can be utilized without injuring crops or land by mixing it with impounded water; that in dry seasons it is necessary to use it; and that, in fact,

during past seasons as much as 20,000 acre-feet have been used by the farmers in the project, and that for that reason it ought to be held by the Association as an emergency reserve in case of a long drought. As was said by the learned trial judge:

"Equitable consideration of the contract, motive, and purposes of the officers of the corporation in entering into the contract, results beneficial or detrimental likely to follow or anticipated, prosperity or financial ruin of the corporation, all these and like questions are foreign to the simple question: Is the contract ultra vires?"

The contention of appellants that the arrangement in the contract amounts to or is a sale of water, and that irrigation water is not a subject of sale, seems to us to stick in the bark. It is true the contract uses language common to deeds and bills of sale, but, as stated earlier in this opinion, it is simply a plan or scheme by which the Association undertakes, in consideration of the Company's buying its pumps and installing others needed and assuming all the expense of their operation and maintenance, to release or grant to the Company the water recovered, and certain waste water. Treating the water pumped as suitable for irrigation, as we must, since the Company is procuring it at great outlay for that purpose, its conservation not being one of the "objects" of the Association as expressed by charter originally or as amended, we see no reason for holding the contract *ultra vires*. It is not a sale of the water in the sense that chattels are sold. The Company gets only its use, and it might lose the right to use it by neglecting to apply it to a beneficial use. We think it may be assumed from the facts disclosed in the appellants' complaint, the contract, and charter, that the drainage of the Salt River project is as much a fixed charge against the Association as the supplying of irriga-

tion water. The arrangement simply strikes out of the Association's annual budget the drainage charge. The arrangement will save the Association some of the expenses of upkeep, but it can hardly be termed a sale of water. The only item mentioned that could be reasonably said to be a sale is the one of 15,000 acre-feet where the Company agrees to take at least that amount annually if the Association should find it necessary to pump from a designated area, but the Association is not bound to sell this water and, of course, would not do so if needed for the use of its shareholders.

But, should it be conceded that the transaction amounts to a sale of the pumped and waste waters under the law, the Association having recovered such water would have the right to dispose of it. These drainage waters are not subject to appropriation. Under paragraph 5337 of the Civil Code of 1913, unappropriated waters, or surplus or flood waters, may be appropriated. Paragraph 5344 declares that all rivers, creeks and streams of running water are public, and for the purposes of irrigation and mining may be appropriated. These provisions of the statute are somewhat enlarged by section 1, Chapter 64, Laws of 1921, which provides:

"The water of all sources of supply, flowing in natural streams, canyons, ravines or other natural channels or in definite underground channels, whether perennial, intermittent or flood waters, waste or surplus water, and of lakes, ponds and springs on the surface, belongs to the public, and is subject to beneficial use as herein provided."

Drainage waters are not of the class specified by the statute as subject to appropriation. The waters involved in this litigation were put into the ground by means of artificial irrigation. They are not naturally in the ground and a part of it, in the sense of coming from a source unknown. They are there-

fore not subject to appropriation under any of the provisions of the statutory law. The person or corporation recovering such waters has the legal right and power to dispose of them by sale or otherwise, if he so chooses. *Hagerman Irr. Co.* v. *East Grand Plains Drainage Dist.,* 25 N. M. 649, 187 Pac. 555.

Third. This objection to the contract is directed to that feature of it that undertakes to dispose of the pumped and waste waters to nonshareholders of the Association to be applied to the irrigation of territory outside the project, and, we think, is largely answered by what we have said concerning appellants' second proposition. Section 9 of article 13 of the charter is as follows:

"The board of governors shall each year fix the charge to be paid for the delivery of water to the lands, the owners of which are not shareholders of the association.

"In addition to the charges fixed for the delivery of water to shareholders who are served with gravity water only, the board of governors shall each year fix an additional charge to meet the additional cost of service of other than gravity water provided that no lift charge shall hereafter be required from lands under the High Line canal as now constructed."

This provision expressly authorizes the Association to deliver water to land owners who are not shareholders, and we think a fair construction of it would permit delivery to any available lands, whether within or without the project. At all events, since the Association is empowered to drain those lands in the project that are water-logged, it necessarily must have the right and power to dispose of the water as an incident to such right, and, if no other disposition can be made of such waters, permit them by their own gravity to run off the project.

The question of the disposition of drainage water by drainage district No. 1, Maricopa county, to the

United States for use on Indian lands of the Gila Indian Reservation, for the consideration of a right of way for drainage canal, was involved in *Wattson* v. *United States,* 260 Fed. 506, 171 C. C. A. 308, and there it was said:

"It is obvious that, if an abundance of water is drained from land, there must be a disposition of such superfluous water. To make provision for disposition of the excess is therefore a matter which is absolutely necessary in carrying out the object of the law and conducting the affairs of the district. . . . Disposition of such waters might be by sale or contract not inconsistent with the purposes of the act; and drainage being accomplished, the particular method of disposition of the drained water is not of material interest to those whose lands are drained."

Fourth. The solicitude of the appellants that they may not be able to get power as they need it, or that the Association may not be able to care for other contracts to deliver power because of the agreement to furnish power to the Company, we think is hardly grounds for injunctive relief. It will be time enough to apply to the court when the anticipated wrong is more imminent or actually occurring, if it ever does occur.

Fifth. The appellants object to that feature of the contract that undertakes to give or grant to the Company, or its assigns, waste water that may flow to the ends of the canals, laterals or ditches or the boundaries of the Salt River project. The suggestion that such a contract would encourage the waste of water cannot be taken as fact. If the Association and its employees should indulge the extravagance of wasting its waters, to the injury of appellants or others of its shareholders, the remedy now sought would be open to them.

In the last proposition the appellants place their right to injunctive relief on the grounds that ˚the water in their lands is their property. In other words, it is contended that it is "infiltrating or percolating water oozing through the soil beneath the surface in undefined and unknown channels, and therefore a component part of the earth, having no characteristic of ownership distinct from the land itself," and consequently the property of the owner of the soil. This is the rule in Arizona and generally. *Howard* v. *Perrin,* 8 Ariz. 347, 76 Pac. 460 (affirmed, 200 U. S. 71, 50 L. Ed. 374, 26 Sup. Ct. Rep. 195 [see, also, Rose's U. S. Notes]); especially where the water gets into the soil by natural processes, and perhaps also where the process is artificial as by irrigation or seepage from canals or ditches. If, however, it be determined that each shareholder of the Association is as much the owner of the water that forms in it from irrigation as he is of his land, still we think on account of his contractual relation, arising by virtue of his membership in the Association, he is or ought to be bound for the common good to surrender ownership and dominion of such water when the Association has concluded it to be to the best interests of all to drain the water out of the lands of the project. *Orme* v. *Salt River Valley Water Users' Assn., supra.* As such owner has submitted by the terms of the charter to employ the Association to carry from the river and the reservoir, and distribute to his lands his proportionate share of irrigation water, in order that he may realize on his lands, so likewise when his land becomes so thoroughly saturated with water as not to be productive, he has consented that the same organization may "construct, install, operate, and maintain pumps, ditches, conduits, and other drainage works, for draining any

or all of the lands receiving water through the irrigation works of the Association.''

This includes the appellants' lands as well as the lands of all others in the water-logged district. If any one owner of land in 'the affected area may on the ground that he is the owner of the water therein prevent its being drained by the Association, it might be asked how the rest of the owners of land in the project could drain their lands, since it is evident without a retaining wall around the lands of the dissenting member his lands also would be drained. The absurdity of permitting an owner of lands in the project, under the claim of ownership of the water in his land, saying to all the other land owners or to the Association that he will not allow his land to be unwatered, except upon his terms, is so patent as that it should receive but slight consideration. Indeed, we do not gather that appellants contest, either as owners of the waters or as shareholders of the Association, the right to dewater the water-logged territory, but do object to the lowering of the underground water-level to a depth that will prevent crops and vegetation from receiving moisture by capillary attraction, and to the length of the contract, and to the unconditional disposition of the water, contending that the Association should retain the right to use water in case of need. The right to unwater being found, the depth thereof, the term of the contract, and disposition of water become matters largely of detail, and unless clearly shown to invade some right of the appellants should be left to the determination of the Association. *Bethune* v. *Salt River Valley Water Users' Assn., supra.*

The honesty, sincerity and good faith of the Association and its officers in entering into the contract is not questioned.

We have carefully looked into the contract and do not find anything therein sustaining or squinting at the allegation of the complaint that "contract proposes" to deliver to Company the nondeleterious water, and leave under appellants' lands "all alkaloid waters."

For the reasons stated, the judgment is affirmed.

McALISTER, C. J., and LYMAN, J., concur.