255 P.2d 173

**BRISTOR et al. v. CHEATHAM et al.**

No. 5334.

Supreme Court of Arizona.

March 14, 1953.

Dwight L. Solomon, of Phoenix, for appellants.

Cunningham, Carson, Messinger & Carson, Snell & Wilmer, by James A. Walsh, and Wilson & Wilson, all of Phoenix, for appellees.

Kramer, Morrison, Roche & Perry, Jennings, Strouss, Salmon & Trask, Moore & Romley, Scott & Green, Walton & Walton, Whitney, Ironside & Whitney, Rawlins, Davis, Christy, Kleinman & Burrus, Lewis, Roca & Scoville, David B. Morgan, Edward E. Williams and Andrew L. Bettwy, all of Phoenix, Reed & Wood, Charles W. Stokes and Harry W. Bagnall, Jr., of Coolidge, Jesse C. Wanslee, of Phoenix, Ellis & Sult and Stanfield & Hernandez, of Eloy, Scanland, Mahoney & Walker, Thomas D. Derry, Tom Fulbright, E. L. Green and Raymond E. Peterson, all of Florence, Estes D. McBryde and Eugene K. Mangum, of Casa Grande, Fred O. Wilson, Atty. Gen., Perry M. Ling, Asst. Atty. Gen., and Howard F. Thompson, Asst. Atty. Gen., amici curiae.

WINDES, Justice.

The appeal is from an order of the lower court in sustaining a motion to dismiss plaintiffs' complaint. For the original majority and minority opinions, see 73 Ariz. 228, 240 P.2d 185. The substance of the allegations of the complaint are set forth therein. Rehearing was granted. Whenever the term ground water is used herein it shall be construed to mean what is commonly called natural percolating water, and when the term majority is used reference is made to the majority original opinion.

The only questions presented by the pleadings, by the assignments of error and by the contentions of plaintiffs in their briefs are whether the plaintiffs have the right to invoke the doctrine of reasonable use or correlative rights and whether, having alleged in the second cause of action an underground stream and prior use of the water thereof, they have alleged an appropriation thereof. It was never alleged in the complaint nor contended by the plaintiffs in assignment of error or briefs that they had appropriated percolating water. This issue was apparently introduced into the case by amici curiae who have no right to create, extend or enlarge the issues. The majority, in deciding to cover the field and re-examine the entire law on the subject as a new question, state that Justice Lockwood predicted the time would arrive when such should be done. Reference is no doubt made to Justice Lockwood's decision in Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Company, 39 Ariz. 65, 4 P.2d 369, 372. Judge Lockwood did not so predict the re-examination of the entire subject but expressly limited any future consideration thereof to a consideration of the doctrines of reasonable use and correlative rights. Without sanctioning the right of the court, under the issues as thus presented, to re-examine the field of ground water

law, since such has been done we will treat it as a legitimate issue.

The majority hold that ground waters are public notwithstanding this court has ruled to the contrary for the past forty-nine years. The bases for such holding are that the common-law rule is an anomaly and fallacious; that the common-law rule is not suited to conditions in the arid Southwest and that the Act of Congress of 1877, 43 U.S.C.A. § 321, operated to sever such waters from the soil. The statute, Section 1–106, A.C.A.1939, tells us when we may depart from the common law, and such departure is not permitted for the reason that we might think the rule to be fallacious and anomalous. Whether we should for any other reason, after approximately fifty years' operation under an announced rule, depart therefrom depends upon many questions, the most important of which is the protection of property rights acquired upon the faith of this court's announcement of the law.

When this matter was thoroughly reexamined twenty-two years ago in the case of Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Company, supra, this court said:

"The case is one of the most important which has ever come before this court, involving as it does not only property interests of the value of many millions of dollars, but also a declaration of legal principles which will in all probability determine and govern to a great extent the course of future agricultural development within the arid regions of Arizona. * * * We think, however, this case is proof that the time has come when it is necessary *for the protection and guidance of future agricultural development* in the state that these principles should be enunciated as clearly and definitely as possible, *so that our citizens may know how to guide their future procedure.* * *"

(Emphasis supplied.)

It is generally so well known that we take judicial notice that, with faith in the foregoing declaration and assurance of this court, many and large investments have been made in the development of ground waters. Under these circumstances the court's announcement of the rule becomes a rule of property, and rights acquired thereunder should not be disturbed "unless the law is such as to leave the court no alternative", Schofield v. Gold, 26 Ariz. 296, 225 P. 71, 74, 37 A.L.R. 275; and when a decision does become a rule of property, the rights acquired thereunder are entitled to protection under the law as declared. The majority opinion seems to recognize that the users of ground water developed under these conditions are entitled to protection but takes the position that they will receive better protection under the law of prior appropriation.

This brings us to the question whether, even if it were assumed ground

waters are public, it is legally possible to acquire any rights thereto under the law of prior appropriation. After deciding that such waters are now and always have been public, the majority proceeds to hold that because they have always been public and have been put to use, they have been appropriated as of the respective dates that beneficial use began. This conclusion is based upon the proposition that because the legislature has not seen fit to declare ground water, as a class of water, subject to appropriation nor provide the steps for the acquisition of appropriative rights, plaintiffs have appropriated under some law of custom and usage, because congress had declared them public and subject to appropriation according to custom and usage prevailing in the arid West. We believe this to be unsound for several reasons. First, we can find no authority for the assumption that there exists any custom and usage to divert ground waters for irrigation purposes and thereby secure a prior right thereto. Under both the civil and common law, ground water belonged to the owner of the soil. Kinney on Irrigation and Water Rights, 2d ed., Vol. I, Sec. 563. Second, even if there had existed such a custom, it cannot prevail nor operate contrary to legislative rule.

In 1864, the territorial legislature provided a rule as to what waters were subject to appropriation, for what purposes they could be appropriated and that they could only be appropriated exclusively under such regulations and restrictions as the legislature provided. Article 22, Territorial Bill of Rights, Section 1, Chapter 55, Howell's Code. The classes of water by this law authorized to be appropriated were streams, lakes and ponds capable of beneficial use for irrigation. During succeeding years, other classes were added and made available for appropriation such as underground streams, flood waters, and spring waters. Session Laws 1919, Chapter 164, Section 1; Session Laws 1921, Chapter 64, Section 1.

The legislature has thus provided laws for the acquisition of public waters, and if there ever existed a custom and usage which authorized the appropriation of these waters (which we do not admit), such cannot be given the force of law contrary to the statute. When the legislature classifies waters that are subject to and available for appropriation, it is a limitation on the right to so acquire waters not classified for such purpose. Brewster v. Salt River Valley Water Users' Association, 27 Ariz. 23, 229 P. 929; Fourzan v. Curtis, 43 Ariz. 140, 29 P.2d 722; Drainage District No. 1 v. Suburban Irrigation District, 139 Neb. 460, 298 N.W. 131.

In Brewster v. Salt River Valley Water Users' Association, supra [27 Ariz. 23, 299 P. 934], in deciding that drainage waters were not subject to appropriation, this court said:

"Drainage waters are not of the class specified by the statute as subject

to appropriation. The waters involved in this litigation were put into the ground by means of artificial irrigation. They are not naturally in the ground and a part of it, in the sense of coming from a source unknown. They are therefore not subject to appropriation under any of the provisions of the statutory law. * * *"

In Fourzan v. Curtis, supra [43 Ariz. 140, 29 P.2d 724], in holding that certain waters were not subject to appropriation, the court said:

"* * *. The only reasonable explanation is that they (meaning the legislators) intended to reiterate the general principle that appropriable waters were only those in their natural condition, and that, realizing the common practice in Arizona of the artificial development of percolating subterranean waters to increase the surface flow of a spring, they meant to prohibit any attempt to evade the long-established rule in Arizona that percolating waters were not subject to appropriation. * * *"

In Drainage District No. 1 v. Suburban Irrigation District, supra [139 Neb. 460, 298 N.W. 136], that court said:

"From the history of our irrigation laws and constitutional provisions, it clearly appears that the expressed purpose of our lawgivers, as now existing, is to limit the right of appropriation for irrigation to the waters of the 'natural streams' of the state. * * *

* * * * * *

"These drainage ditches are not natural streams or natural water courses, and their inherent nature exclude them from the class or kind of waters to which our laws of appropriation are now applicable. Not being subject to appropriation for irrigation purposes, the attempt to secure them for the defendant by the exercise of the right of eminent domain was unauthorized by our present laws and wholly ineffective. * * *"

We therefore cannot agree with the majority in holding that ground water is subject to appropriation. By every rule of statutory construction of which we have knowledge, the legislature has in effect said that it is not. When waters are classified for appropriation, it operates as a statutory limitation and excludes all waters not included therein. To say otherwise would permit the court to amend the statute by adding thereto other classes, which of course is strictly a legislative function. As was well said in Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Company, supra:

"Reading these successive enactments, we think it is clear the Legislature has never specifically made percolating waters subject to appropriation, and, if we apply the usual rule of

'expressio unius,' has very carefully excluded them therefrom."

 The majority seems to think that the congressional Act of 1877, having severed ground waters from the soil, likewise carried with it a right to appropriate the same. Even if the premise were true that such waters are thus severed, the conclusion that the Act also gives some rights to appropriate is unsound. California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 55 S.Ct. 725, 79 L.Ed. 1356; Platt v. Rapid City, 67 S.D. 245, 291 N.W. 600.

The case of California Oregon Power Co. v. Beaver Portland Cement Co., supra, upon which the majority relies so strongly, recognizes that the source of the right to appropriate must come from the state. Therein the court said [295 U.S. 142, 55 S.Ct. 731]:

"* * * 'Congress cannot enforce either rule upon any state,' Kansas v. Colorado, 206 U.S. 46, 94, 27 S.Ct. 655, 666, 51 L.Ed. 956 [973], the full power of choice must remain with the state. The Desert Land Act does not bind or purport to bind the states to any policy. It simply recognizes and gives sanction, in so far as the United States and its future grantees are concerned, to the state and local doctrine of appropriation, and seeks to remove what otherwise might be an impedi-

ment to its full and successful operation. * * * * "

The state of Arizona through its legislature has adopted its policy and local doctrine to the effect that ground waters are not subject to appropriation. It seems the only answer, therefore, is that a prior right to the use of ground waters cannot now be acquired and never could have been acquired under the law of prior appropriation. We hold, therefore, that such waters are not subject to any law of appropriation. Consequently the protection offered by the majority does not exist, and they have no protection except that offered by the common law as heretofore enunciated in Howard v. Perrin, 8 Ariz. 347, 76 P. 460, and subsequently approved in Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., supra.

 It is claimed that if we do not change the law, ground waters will be exhausted and the legislature is shackled and powerless to enact a ground water code. If the legislature is shackled, it is the constitution that imposes the impediment. The court has no right to pull the rug from under the owner and release the constitutional obstructions, if any. It is the court's duty to protect constitutional rights. Possibly the only source of power the legislature possesses is the police power for the general welfare. Such power has been repeatedly used in numerous instances to limit the exercise of property rights. It has

been exercised in the regulation of water. Hudson County Water Co. v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828. California-Oregon Power Co. v. Beaver Portland Cement Co., 9 Cir., 73 F.2d 555. We do not mean to say whether or to what extent such police power may be used to affect the rights involved herein. That is not before us. Should it ever be presented we will decide the matter.

With reference to the dismissal of the complaint, we consider the first cause of action thereof. This cause alleges that the plaintiffs since the year 1916 sank certain wells which supplied them with water for domestic purposes; that during the years 1948 and 1949 the defendants sank on their lands a number of large wells for irrigation purposes; that by the operation thereof the water has been drawn from under plaintiffs' lands causing the level to drop to the extent that plaintiffs were deprived of such waters for domestic purposes; that defendants are transporting the water thus pumped from under plaintiffs' land to a distance of approximately three miles for the development and irrigation of lands not theretofore irrigated; that the waters pumped by the defendants are not used for any beneficial purpose upon the lands from which the same is taken and that the plaintiffs have been suffering and will continue to suffer damages.

Whether the foregoing states a cause of action depends upon whether this court is going to follow the English common-law rule that the owner of lands overlying subterranean waters may extract the same for any purpose he chooses with a resulting damage to an adjoining owner without liability therefor, or whether we adopt what is called the American rule that one may extract such water for a reasonable, beneficial use of the land from which the same is taken. This court has never passed upon the question and in Maricopa County Municipal Water Conservation District No. 1 v. Southwest Cotton Co., supra, that question was expressly reserved for future consideration.

A great majority of the states which in recent years have been presented with this problem adhere to the principle that the owner of lands overlying ground waters may freely, without liability to an adjoining user, use the same without limitation and without liability to another owner, providing his use thereof is for the purpose of reasonably putting the land from which the water is taken to a beneficial use. Evans v. City of Seattle, 182 Wash. 450, 47 P.2d 984; Rothrauff v. Sinking Spring Water Co., 339 Pa. 129, 14 A.2d 87, 90. In the last mentioned case, we find the principle stated thus:

"* * *. But the marked tendency in American jurisdictions in later years has been away from the doctrine that the owner's right to sub-surface waters is unqualified; on the contrary there has been an ever-increasing ac-

ceptance of the viewpoint that their use must be *limited to purposes incident to the beneficial enjoyment of the land from which they are obtained,* and if their diversion or sale to others away from the land impairs the supply of a spring or well on the property of another, such use is not for a 'lawful purpose' within the general rule concerning percolating waters, but constitutes an actionable wrong for which damages are recoverable. While there is some difference of opinion as to what should be regarded as a reasonable use of subterranean waters, the modern decisions are fairly harmonious in holding that a property owner may not concentrate such waters and convey them off his land if the springs or wells of another landowner are thereby damaged or impaired. * * *" (Emphasis supplied.)

Some courts have extended the doctrine by limiting the taking of water, when there is a scarcity thereof, to only the landowner's proportionate share thereof. The former is the doctrine of reasonable use and the latter is the doctrine of correlative rights. The terms are often used interchangeably, but they are distinct doctrines. Kinney on Irrigation and Water Rights, 2d ed., Volume II, Section 1192; Evans v. City of Seattle, supra; Canada v. City of Shawnee, 179 Okl. 53, 64 P.2d 694, 696. We think the better rule is that of reasonable use as distinguished from the doctrine of correlative rights. As stated in Canada v. City of Shawnee, supra:

"* * *. This does not mean that there shall be an apportionment of subterranean percolating water between adjacent landowners, for such a thing is often, if not always, impossible, and it was this same impossibility which gave rise to the English rule itself. The rule of reasonable use as to percolating waters is merely the application of the same rule as it affects all property, for ownership of property, does not vest one with the right to injure his neighbor with the use of that property. * * *"

We have held many times that when not bound by previous decision or legislative enactment we would follow the Restatement of the Law, Ingalls v. Neidlinger, 70 Ariz. 40, 216 P.2d 387, and this subject is quite thoroughly considered in Restatement of Law of Torts, Volume IV, Chapter 41, Topic 4, Page 387. Section 860 thereof says:

"A possessor of land who, in using the subterranean water therein, intentionally causes substantial harm to a possessor of other land through invasion of the other's interest in the use of subterranean water in his land, is liable to the other if, but only if, the harmful use of water is unreasonable in respect to the other possessor."

The principal difficulty in the application of the reasonable use doctrine is in determining what is reasonable use. There are various uses that have been held reasonable or unreasonable depending upon the nature of the use, as reflected in the annotations found in 55 A.L.R. 1385 and 109 A.L.R. 395. What is a reasonable use must depend to a great extent upon many factors, such as the persons involved, the nature of their use and all the facts and circumstances pertinent to the issue. The principle is well stated in Restatement of Law of Torts, Comments b and c, Section 852:

"* * * As such it is a question which must be determined in each case in view of the persons involved and the particular facts and circumstances. A use that may be reasonable under certain circumstances may be unreasonable under different circumstances, and a use by A that may be reasonable as to B may be unreasonable as to C. In some localities certain uses of water may, because of fairly uniform conditions, be so continuously found to be reasonable or unreasonable that in the absence of exceptional circumstances they can be said to be so as a matter of law in that particular place. * * *

"* * * The determination in a particular case of the unreasonableness of a particular use is not and should not be an unreasoned, intuitive conclusion on the part of a court or jury. It is rather an evaluating of the conflicting interests of each of the contestants before the court in accordance with the standards of society, and a weighing of those, one against the other. The law accords equal protection to the interests of all the riparian proprietors in the use of the water, and seeks to promote the greatest beneficial use by each with a minimum of harm to others. But when one riparian proprietor's use of the water harmfully invades another's interest in its use, there is an incompatibility of interest between the two parties to a greater or lesser extent depending on the extent of the invasion, and there is immediately a question whether such a use is legally permissible. It is axiomatic in the law that individuals in society must put up with a reasonable amount of annoyance and inconvenience resulting from the otherwise lawful activities of their neighbors in the use of their land. * * *"

While the foregoing quotation is concerning reasonable use between riparian owners, the same work in Section 861 states that the problem of determining the reasonableness is the same whether the water is in a water course or lake or under the surface of the earth and that the foregoing comments are applicable to ground water.

This rule does not prevent the extraction of ground water subjacent to the soil so long as it is taken in connection with a

beneficial enjoyment of the land from which it is taken. If it is diverted for the purpose of making reasonable use of the land from which it is taken, there is no liability incurred to an adjoining owner for a resulting damage. As stated in Canada v. City of Shawnee, supra:

" * * * the rule of reasonable use as applied to percolating waters 'does not prevent the proper user by any landowner of the percolating waters subjacent to his soil in agriculture, manufacturing, irrigation, or otherwise; nor does it prevent any reasonable development of his land by mining or the like, although the underground water of neighboring proprietors may thus be interfered with or diverted; but it does prevent the withdrawal of underground waters for distribution or sale for uses not connected with any beneficial ownership or enjoyment of the land whence they are taken, if it thereby result that the owner of adjacent or neighboring land is interfered with in his right to the reasonable user of subsurface water upon his land, or if his wells, springs, or streams are thereby materially diminished in flow or his land is rendered so arid as to be less valuable for agriculture, pasturage, or other legitimate uses.' "

 We hold, therefore, that the first cause of action states sufficient facts to warrant relief if supported by the proper evidence.

 Concerning the second cause of action, plaintiffs allege that at various times since 1916, they sank their wells for the purpose of supplying themselves with domestic water from an underground stream and that defendants are pumping from the same source. It is apparent plaintiffs are attempting to allege prior appropriation of underground stream water. It is not clearly so stated but applying the doctrine of reasonable intendment and considering our new liberal rules of pleading, we so construe these allegations. Certainly it will be necessary for the plaintiffs to prove prior appropriation in accordance with the law in existence at the respective times they claim such appropriations were made before they can prevail on this basis.

Judgment is reversed with directions that the complaint be reinstated and that further proceedings be had in accordance with the principles announced.

STANFORD, C. J., and LA PRADE, J., concur.

PHELPS and UDALL, Justices (dissenting).

For the sake of clarity we shall term the court's opinion of January 12, 1952 as the majority opinion and shall designate the present court's opinion on rehearing as the prevailing opinion.

We held in the majority opinion that the lower court erred in dismissing the plaintiffs' complaint as to the first cause of action and to that extent we now agree with the prevailing opinion which arrives at the same conclusion. However, the basis for our holding is so diametrically opposed to the rationale of the prevailing opinion authored by Justice WINDES that we are impelled to register our disagreement with the principles enunciated therein.

There has never been disagreement between any of the members of the court that the second cause of action stated a proper "claim for relief," and that the lower court erred in dismissing that cause of action instead of putting plaintiffs to their proof.

At the outset let it be known that in the intervening months since handing down the majority opinion we have completely re-examined the law relative to percolating waters in Arizona and are even more firmly of the opinion (1) that the Congressional Desert Land Act of 1877 effected a severance from the land of all waters upon *and under* the public domain; (2) that percolating waters being migratory were not thereafter entitled to be considered as inherent in the soil or a component part of the earth and thereby the property of the owner of the overlying soil, as was held by this court in the case of Howard v. Perrin, 1904, supra; (3) that the Perrin decision and the later cases following it should be expressly overruled; (4) that

inasmuch as this never was the law the rule of stare decisis should not be applied; and (5), that no rights have been acquired thereunder which have ripened into "a rule of property". [240 P.2d 188.] Nor is there anything in the prevailing opinion that would cause us to change the pronouncement contained in the original majority opinion to the effect, (a) that at least since 1877 percolating waters have been and are public in character; (b) are subject to appropriation and application to beneficial use under the acknowledged and accepted customs and usages of this state until the legislature prescribes other methods; and (c) that no act of the legislature of the territory or of the state of Arizona was necessary to invest percolating waters with the character of public ownership.

Without reiterating what has been previously said we shall attempt to confine this dissent to pointing out the weaknesses, as we see them, in the prevailing opinion.

First, it cannot be said that lakes or pools underlying the lands located in the valleys of Arizona fed by percolating waters for centuries upon centuries and eons upon eons were not a source of water supply in existence when the Desert Land Act was passed in 1877 as much so as now, nor that they were not plainly embraced within the language of the act. Justice Sutherland in construing the language of this act in California Oregon Power Co. v. Beaver Portland Cement Co., supra [295 U.S. 142, 55 S.Ct. 729], said:

"* * * it effected a severance of *all waters* upon the public domain, not theretofore appropriated, from the land itself. * * *" (Emphasis supplied.)

This pronouncement is in irreconcilable conflict with the rule laid down by this court in Howard v. Perrin and subsequent cases which the prevailing opinion in effect reaffirms, enlarged by the reasonable use doctrine. If the act of Congress severed water *from all sources of supply* from the land, this court may not by its ipsi dixit reunite it with the land thereby divesting it of its public character and clothe it with the attributes of private ownership. In the face of this act and the decisions of the United States Supreme Court interpreting it the prevailing opinion is unable to do more than "assume" (but not admit) that percolating waters are public.

Great reliance is placed upon the excerpts quoted from the Restatement of the Law (Torts). One compelling reason why the Restatement should not be followed in the instant case is that the principle enunciated, if applied to the arid region of the West, conflicts with the "legislative enactment" of Congress in passing the Desert Land Act which is binding upon us. Further, the text along with the preliminary drafts and proceedings of the Institute discloses the authors were concerned only with riparian rights which included both surface and subsurface waters. Such a rule should have no weight in Arizona because the riparian right doctrine has long been repudiated in this jurisdiction. This principle is firmly imbedded in article 17, section 1, Constitution of Arizona:

"The common-law doctrine of riparian water rights shall not obtain or be of any force or effect in the state."

The scope note to Topic 3 of chapter 41, Restatement of Law, supra, refutes the suggestion that it is authority for the rule enunciated in the prevailing opinion. It states in part:

"In some Western States in this country, notably Arizona, Colorado, Idaho, Nevada, New Mexico, Utah and Wyoming, the common law of Riparian Rights has not been adopted. The courts in those jurisdictions have held that *the law of Prior Appropriation,* which grew up in the early pioneer days, *is their common law.*" (Emphasis supplied.)

With respect to the application of the law of prior appropriation to underground waters the prevailing opinion makes the startling declaration that

"* * * we can find no authority for the assumption that there exists any custom and usage to divert ground waters for irrigation purposes and thereby secure a prior right thereto. * * * even if there had existed such a custom, it cannot prevail nor operate contrary to legislative rule."

It also declares that "Under both the civil and common law, ground water belonged to the owner of the soil", citing Kinney on Irrigation and Water Rights, 2d Ed., Vol. 1, section 563. An examination of this section in our opinion fails to confirm the statement above quoted.

This court in the case of Clough v. Wing, 2 Ariz. 371, 17 P. 453, 455, decided in 1888, after an exhaustive recitation of the history of irrigation stated that:

"* * * From 'time whereof the memory of man runneth not to the contrary,' the rights of riparian owners were settled in the common law; and the right to appropriate and use water for irrigation has been recognized longer than history, and since earlier than tradition. * * * The same was found to prevail in Mexico among the Aztecs, the Toltecs, the Vaquis, and other tribes at the time of the conquest, and remained undisturbed in the jurisprudence of that country until now. * * *

"* * * Up to about a third of a century ago, and but recently before this enactment [the act of the Arizona legislature of 1864], the territory of Arizona had been subject to the laws and customs of Mexico, and the common law had been unknown; and that law has never been, and is not now, suited to conditions that exist here, so far as the same applies to the uses of water. (Citing cases.)

"The 'local customs' of the act of 1866 [act of Congress], so far at least as it refers to rights to the use of water, is not a mere usage or custom, requiring proofs of undisturbed continuance beyond the memory of man. 1 Greenl.Ev. § 128. The courts take knowledge of them as of the public laws. * * * 1 Greenl.Ev. § 5, * * *."

See also Boquillas, etc., Co. v. St. David, etc., Ass'n, 11 Ariz. 128, 89 P. 504.

The above quotation makes it doubly clear that the citations of authorities in the prevailing opinion from riparian right jurisdictions can have no application to water problems in Arizona where the doctrine of prior appropriation has prevailed since before the Spanish conquest of Mexico.

It is our position that the act of the legislature in declaring certain of the waters of Arizona to be public is a voluntary recognition of a pre-existing right rather than the establishment of a new one and was therefore unnecessary except for regulatory purposes.

The prevailing opinion then asserts that the legislature has provided laws for the acquisition of the right to use public waters and if there ever existed a custom or usage which authorized the appropriation of these waters such cannot be given force of law contrary to statute. This is not entirely accurate. The legislature has never

passed a law relating to the acquisition of the right to use percolating water. And it was not until 1919 that it declared springs, lakes and underground channels to be subject to appropriation. Can it be seriously contended that the act of Congress in severing the water from the land did not include the water from lakes and springs upon the public domain? Let us point out that the Congress of the United States has expressly declared all waters from every source to be public and subject to appropriation. That law is the supreme law of the land and the legislature of this state can pass no valid law in conflict therewith. Having passed no law with respect to the appropriation of percolating waters, their appropriation is controlled by the prevailing custom and usage relating to the appropriation of public waters in this area since long before it was acquired by the United States from Mexico. The legislature may prescribe the steps to be taken to perfect an appropriation of percolating waters. It may regulate their use; perhaps fix the level below which underground water may not be lowered; or prohibit their use altogether if the circumstances justify it. In short its powers relating thereto are plenary except where Congress has entered the field or where the waters have already been appropriated. We believe that the Supreme Court of the United States in the California Oregon Power Co. case, supra, meant nothing more than this when it said:

"* * * Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. * * *"

It certainly never intended to say that the legislature could pass a law that would declare the waters covered by the act of Congress to belong to the land and therefore privately owned by the owner of the soil under which they may be found. The failure of the legislature to prescribe such steps by which this character of water may be appropriated does not have the effect of changing its character of public ownership nor the right to appropriate it according to the local usage and custom by putting it to a beneficial use and that right will continue to prevail until the legislature does act.

The prevailing opinion, after holding that the rule first announced in Howard v. Perrin has now ripened into a "rule of property" very cautiously opines, before embracing the reasonable use doctrine, that for the future "Possibly the only source of power the legislature possesses (to regulate the use of water) is the police power for the general welfare." If this be true there are rough times ahead for the reason that Arizona will be on an unchartered sea. While there are isolated instances where police power has been invoked to regulate water to solve a particular local problem,

our research attests that no jurisdiction in the United States has attempted to regulate on a state-wide basis the use of waters, either surface or percolating, under its inherent police power.

The magnitude of the regulatory task ahead becomes more apparent when it is realized that three-fourths of the irrigated crops grown in Arizona last year were produced from pumped waters. And it becomes even more appalling when we consider that the volume of underground waters being annually withdrawn is many times greater than the recharge. We predict that the mad race to "mine" percolating waters which are our greatest natural resource will continue unabated until such time as these waters are declared to be public in character and suitable regulatory measures are adopted. We are confident that the inexorable judgment of time will confirm the views expressed in the original majority opinion and in this dissent.

It is asserted in the prevailing opinion that a great majority of the states confronted with this problem in recent years have adopted the reasonable use doctrine. As applied to riparian right jurisdictions this is probably a correct statement. We note however that the jurisdictions cited in support of the assertion are from the Atlantic and Pacific seaboards where too much rather than too little water is the problem. It is noticeable that the arid states of the West are not included. The great majority of the latter do not stop short of prior appropriation and beneficial use in regulating the use of both their surface and percolating waters.