No. 29,517.

ADOLPH LAURENCE MARESH, *Appellee,* v. PEORIA LIFE INSURANCE COMPANY, *Appellant.*

(299 Pac. 934.)

Opinion filed June 6, 1931.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove,* all of Topeka, *Gilbert H. Frith, C. V. Beck,* both of Emporia, and *J. B. Wolfenbarger,* of Peoria, Ill., for the appellant.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt, Virgil V. Scholes, Margaret McGurnaghan,* all of Topeka, *O. T. Atherton* and *E. H. Rees,* both of Emporia, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recover on a life insurance policy which also provided for payment of a monthly income for life in case of total and permanent disability. Plaintiff recovered, and defendant appeals.

The policy was dated February 11, 1927. At that time plaintiff lacked a few days of being twenty-six years old, was six feet two inches tall, and weighed 200 pounds. His common-school education ended with the first year in high school. After that he took a two and a half months' course in business college. His studies there were penmanship, arithmetic, business spelling, and commercial law. For a time plaintiff was an uncertified substitute who helped the mail clerk on mail trains. He had worked some for neighbors, had worked with a road construction company, and had never made a living other than by manual labor. When the policy was issued

his occupation was farming. He and his brothers farmed together, with his father, and he had no expectation of changing his occupation.

On August 5, 1927, while plaintiff was plowing with a tractor, the wheel of the tractor ran over him and crushed his chest, and the cutter of the plow cut his right foot and left leg. It was about an hour and a half after the accident before plaintiff was discovered, and his bloody wounds were then filled with dirt. He was taken to a hospital, and his injuries were found to be very severe. The wounds on the foot and leg became infected, and the pus ran from them for a long time. He developed traumatic pneumonia, which was followed by empyema. A section of a rib was removed, and the pleural cavity was drained by tubes for six or eight weeks. From the pneumonia condition bronchitis developed. In the hospital plaintiff had fluid in the bronchial tubes, and air passing through made a sound like soda water. He remained in the hospital seventeen weeks. After he went home from the hospital he had paroxysms of coughing, and it was necessary to administer morphine to quiet him.

On December 15, 1928, plaintiff commenced an action to recover on the following provisions of the policy:

"*For total and permanent disability:*

"Upon the receipt of proof satisfactory to the company that the insured is totally and permanently disabled as hereinafter defined, the company will:

"*Company will pay premiums:*

"1. Pay for the insured all premiums becoming due hereon after the receipt of such proof and during the continuance of the total and permanent disability of the insured, and will also

"*Pay monthly income for life:*

"2. Pay to the insured a monthly income for life of one per cent of the face of this policy; the first payment of such income to be paid immediately upon receipt of such proof, and subsequent payments to be made on the first day of each month thereafter as long as the insured shall live and be totally and permanently disabled as hereinafter defined. . . .

"Total and permanent disability of the insured must be due to bodily injuries or disease occurring while this policy is in full force, and before the insured shall have attained the age of sixty years, and must be such as to prevent the insured then and at all times thereafter from performing any work or conducting any business for compensation or profit; provided that, notwithstanding proof of disability may have been accepted by the company as satisfactory, the insured shall at any time, on demand, but not oftener than once in each period of twelve months, furnish proof satisfactory to the company of the continuance of such disability, and if such proof is not furnished,

or if it shall appear to the company that the insured is able to perform any work, or to conduct any business for compensation or profit, then the company shall cease to pay or allow the above benefits, and the insured shall immediately resume the payment of premiums hereon. The company will extend the privileges and benefits for total and permanent disability hereunder to cover the irrecoverable loss of the entire sight of both eyes, or the severance of both hands at or above the wrists, or of both feet at or above the ankles, or of one entire hand and one entire foot."

In the petition plaintiff's disability was pleaded as follows:

"That as a result of the injury to his chest, pneumonia developed, which was complicated by empyema, which necessitated an operation, and part of one rib was resected, and the pleural cavity drained and his lungs permanently injured. He sustained and has a permanent paralysis of the left external popliteal nerve, resulting in a foot drop, and he suffered a division of the right posterior tibial artery just in front of the malleolus, which resulted in inefficient circulation to the right foot to such an extent that he had no use of the said foot so that he can use it to any extent; that on the right leg all extensor tendons except to the little toe are severed as well as the nerves of sensation on the inner side, or if the tendons are not severed they have adhered to the scar so as to be permanently useless; that since said accident, this plaintiff has been unable to do any work, and was by said accident permanently and totally disabled from carrying on his business and from performing any work or conducting any business for compensation or profit."

At the trial the experts debated whether plaintiff had bronchiectasis, which is a disease of the bronchial tubes. There was some uncertainty with respect to existence of that form of disease, but there was evidence that plaintiff's breathing apparatus is not normal, and the condition causes shortness of breath, troubles plaintiff when he undertakes something requiring exertion, prevents him from doing work requiring exertion, and makes it important he should be out in the open air in a good climate.

A qualified surgeon testified as follows:

"On my examination of June 11, 1928, the left leg presented a healed scar right in here—about four inches in length; the left leg was smaller than the right, about one and one-half inches. The left foot was down, and the heel part was slightly shortened. There was pretty good circulation in the foot and leg, but no sensation. He couldn't tell when the outside of the foot was being touched. There was some sensation on the inner side. On the right foot there was a scar extending from the back of the heel across to the front of the ankle, just below the ankle joint. This scar was healed, but the tendons were caught apparently in the scar so he had very little movement of the four toes. He· could move the little toe. There was apparently some disturbance in the circulation in following the scar—and of the sensation. The foot

pulled in, and had a tendency to roll under him. He had good movement in the ankle going up and down this way (indicating).

"On April 1, 1929, the condition was very similar. He still had the drop foot, and the circulation in the right foot was impaired as well as the sensation, and the toes still flexed. Both feet and legs were in about the same condition, and there had been shrinkage of the muscles along the calf a little since the first examination.

"The condition to-day is about the same—a little more shrinking of the left leg, perhaps; it is about one and three-quarter inches smaller than the right one—originally it was about one and one-half inches. I think there is perhaps a little pull in the right foot and the rolling under of this foot—the scars across the instep, and he has a drop foot on the left side. His condition is permanent. . . .

"Q. In order to save time, would you say he would be able to perform any manual labor for any length of time? A. I would say not, to follow it continuously as a gainful occupation.

"Q. Would you advise an operation? A. No, sir. . . .

"I refer to his gainful occupation continuously. The difficulty is that he cannot be sure of himself—sure of his feet in walking or stepping—he has no control of himself unless he can see pretty much where he is going. I think he might drive a car. I do not think he could get around at night very well. His feet and legs are in such shape he can't safely get about—isn't able to control himself. Circulation is impaired, and he has a severe nerve injury; and in some parts there is no feeling."

There was other expert testimony to the same effect. There was also expert testimony that plaintiff would get tired if required to be on his feet for several hours, and plaintiff testified he could not stand for more than half an hour to an hour, because his feet would begin hurting him.

There was testimony that plaintiff cannot carry on the usual and ordinary activities which farming requires. He helps his mother with housework, washes and dries dishes, and brings in wood and some water. He works in the garden a little, but he cannot get down on his feet, and cannot get about in the rough ground of the garden on account of the condition of his feet. After a half hour's work he is obliged to quit for the day. He could handle a peck of corn to feed two or three hogs and a few chickens. Sometimes he drives a Buick car, takes his sister to school, and gets groceries in town. He does this with difficulty, and on some days he cannot do it at all. There was testimony that he was not physically fit to drive a taxi. He could not help passengers in and out and handle baggage. He goes to town, and occasionally plays pool. He can make use of his feet on a level surface, and he sits down during his opponent's

innings.  A witness for defendant was sure plaintiff would make a good insurance solicitor—he could go out and tell people about his disability.  The testimony was very persuasive that he could not do much going out, and just how he could sell insurance successfully while he is a living witness to the fact the insurance company refuses to pay for his disability, was not explained.  The same witness testified that plaintiff's limping was faked.  A physician who was a witness for defendant said he would be willing to accept plaintiff as his chauffeur.  Just how plaintiff could manage the foot controls of the car with necessary dexterity in traffic, on an emergency call, the doctor did not explain.

The testimony raised two questions:   (1) Was plaintiff prevented from performing any work, or conducting any business for compensation or profit? and (2), was his disability permanent?  The answers to these questions depended on the interpretation to be given the policy.  The terms used were universals: "performing any work;" "conducting any business;" "then, and at all times thereafter."  These terms have no meaning in the abstract.  They must be applied to some man, having some degree of disability, plunged by disability into a new and complicated fact situation.

The court regards the policy as one designed to provide a substitute for earnings when the insured is deprived of capacity to earn by bodily injury or disease.  He must be prevented from performing work and conducting business for compensation or profit.  Interpreting the policy in the light of its purpose, the words "performing any work" mean engaging in any gainful occupation or employment in the customary manner as a workman.  The words "conducting any business" mean managing, directing, controlling, or carrying on habitually any gainful enterprise involving transactions, dealings, and the like, as distinguished from work as just defined.  The words "for compensation or profit" mean remuneration for effort expended in performance of work or conduct of business.  The definitions contemplate the substantial doing of those things which are generally regarded as constituting performance of work and conduct of business, and not simply the sporadic doing of simple tasks, or the giving attention to simple details incident to performance of work or conduct of business.  The definitions also contemplate that compensation shall be in a fair sense remunerative, and not merely nominal.  Of course, a business conducted for

profit may in fact not yield a profit, but the business contemplated is business conducted for profit in a remunerative sense.

The subject of what plaintiff is and will be able to do was fully investigated at the trial. It was a fair inference that plaintiff's capacity, so far as his doing work was concerned, was capacity to do manual labor. After he was injured he could do a little manual labor, under special conditions, for short times. There was no substantial evidence that he could perform work for compensation or profit in any department of labor or industry, as workmen are employed to perform work, and as workmen are remunerated for doing work. It was a fair inference that plaintiff's capacity, so far as conducting business was concerned, was capacity to farm. After he was injured he could do a few things about the farm, under special conditions, and for short times. There was no substantial evidence that he could do what is involved in the conduct of farming operations, for profit to himself or to others, or for remunerative compensation.

Because the testimony was conflicting the district court was obliged to send the issue of extent of disability to the jury. The jury were instructed fully and repeatedly that in order to recover it was incumbent on plaintiff to prove that his disability was such as to prevent him from performing any work or conducting any business for compensation or profit. The jury were instructed, however, that total disability did not mean a state of absolute helplessness, and that plaintiff might be totally disabled, so as to prevent him from performing any work or conducting any business for compensation or profit, within the meaning of the policy, although he might be able to perform some small or trivial or some insignificant or unimportant part of any work or business. The instructions conformed to the views which have been expressed.

Defendant requested an instruction to the effect that plaintiff could not recover merely because he cannot perform the work of a farmer. The requested instruction contained other propositions with which the court does not agree, and was properly refused for that reason. In view of the testimony at the trial, and the wide-open instructions concerning performing any work or conducting any business, there was no need for a special reference to farm work, conceding it would have been proper to stress a particular work or business.

The words of the policy relating to permanency of disability are

"then and at all times thereafter." There was no dispute that plaintiff was wholly disabled at the time of his injury and for a long time afterward. There was testimony that the physical deficiencies which disabled him are permanent, and the jury found specifically that as a result of the accident plaintiff was permanently disabled. Therefore permanency in the absolute sense of at all times while plaintiff lives was established.

Permanency of disability is usually a matter of prediction. There may be certainty to a high degree, and there may be uncertainty. What seem to be hopeless cases may improve, and do improve. The progress of science may disclose remedies. Helpful appliances may be invented. Latent capacities and powers may be energized until the apparently helpless become marvelously capable. These facts are recognized by the policy. The company may accept proof of disability as satisfactory, pay premiums, pay monthly income, await developments, and then call for proof of permanency of disability. Defendant did not do that. It paid nothing, and required plaintiff to establish permanency of disability by proof in court at a trial of the issue. Courts are established to determine just such issues, the procedure is the ordinary everyday court procedure, the method of review of verdict and judgment is the ordinary everyday method of review, and an affirmed judgment is a final determination of the controversy.

In this instance the question of permanency was submitted to the jury by an instruction which reads:

"Such total disability is permanent whenever it is founded upon conditions which render it certain, established to your satisfaction by a preponderance of the evidence, that it will continue throughout the life of the person suffering from such injuries."

Defendant requested an instruction to the effect it was the duty of plaintiff to exercise every reasonable effort to aid recovery. The contract does not so provide. No doubt it is the moral duty of every person to make the most of himself under even the most adverse circumstances; but the issue in this case was whether plaintiff's disability was permanent.

The court has fully considered the authorities cited by counsel. If the court were to review them adequately, it would be necessary to discriminate between classes of insurance and between policy provisions; to state the essential facts of cases; and then to state and appraise the decisions. Such a review would require more time

than the court can devote to it. In this instance the court has not recognized the so-called strict and liberal methods of interpreting indemnity policies. The court has taken the words of the policy as it finds them, and as persons would usually and ordinarily understand them when used to express the purpose for which they were employed. So considered the evidence authorized the jury to say that, while this man can do a number of things, chiefly petty, he cannot work or conduct business for compensation or profit, and never will be able to do so.

The judgment of the district court is affirmed.