PRUDENTIAL INS. CO. OF AMERICA v. DAVIS.—78 S. W. (2d) 358.

Eastern Section. November 3, 1934.

Petition for Certiorari denied by Supreme Court, January 25, 1935.

414

. Williams, Miller & Winston, of Johnson City, for plaintiff in error, Insurance Co.

H. D. Erwin and Fred D. Booth, both of Erwin, for defendant in error, Davis.

FAW, P. J.  Pursuant to an opinion heretofore handed down and filed, a judgment was entered in this cause striking the case from the docket of this court, for the reason that the record did not show a verdict, judgment, or appeal, and therefore did not disclose the facts necessary to vest this court with jurisdiction of the case.

Thereafter, in due season, the Prudential Insurance Company of America filed a petition for a rehearing, and for leave to suggest a diminution of the record so as to supply a transcript of certain entries on the minutes of the circuit court of Unicoi county, which entries, it was alleged in the petition and shown by satisfactory evidence, had been, by inadvertence and oversight of the clerk of said circuit court, omitted from the transcript of the technical record, or record proper, filed in this court.

The petition is accompanied by a duly certified transcript of the aforesaid minute entries, which show that this case was tried to a jury and the jury found all of the issues in favor of the plaintiff (Wesley P. Davis) and against the defendant (Prudential Insurance Company of America), and that plaintiff is entitled to recover from the defendant the sum of $3,000, payable in twenty-four equal monthly installments, commencing on January 4, 1932; that the defendant moved the court for a new trial, which motion was entered on the minutes of the court; that the court overruled said motion, and judgment of the court was pronounced and entered upon, and in accordance with, the verdict of the jury; that the defendant excepted to the action of the court in overruling its motion for a new trial and rendering judgment against it, and prayed an appeal in the nature of a writ of error to this court, which appeal in error was granted by the trial court and time was allowed the defendant in which to file proper appeal bond and a bill of exceptions.

The record shows that an appeal bond and a bill of exceptions were seasonably filed by the defendant.

The petition for a rehearing is granted, and our former judgment striking the case from the docket is vacated and set aside.  The supplemental transcript exhibited with the petition will be filed as a part of the record in this court, and the judgment of the circuit court, so far as challenged by the assignments of error, will be reviewed on the record.

This suit was brought by Wesley P. Davis to recover the "total and permanent disability" benefits provided by a group insurance policy issued to the Clinchfield Railroad Company and a certificate thereunder issued to the plaintiff below (hereinafter called plaintiff) by the Prudential Insurance Company of America, the defendant below (and hereinafter called defendant).

Plaintiff was forty-two years of age at the time of the trial below in August, 1933. He was employed continuously by the Clinchfield Railroad Company as a brakeman for fourteen years, which period of active service covered the date of the issuance of the aforesaid group policy and certificate, and thereafter until February 7, 1931, on which latter date plaintiff was injured by falling from a railroad car, and has not worked for the railroad company since that time.

Plaintiff states in his testimony that the fall above mentioned broke his hip "all to pieces—crushed it."

Dr. Hankins, who X-rayed plaintiff's pelvis shortly after plaintiff was injured, describes plaintiff's injury (in more technical language) as "a fracture of the wing of the right ilium."

Plaintiff paid the premiums stipulated in the policy "to the first of the year 1932," and on January 4, 1932, furnished "proofs" of disability to defendant; but defendant declined to accept the proofs thus furnished as "proof of permanent disability" and denied liability to plaintiff on the policy.

The certificate issued to plaintiff, pursuant to and in accordance with the terms and provisions of the group policy, provides for the payment to the named beneficiary (the wife of plaintiff) of the sum of $3,000 upon the death of the insured "from natural causes," and also provides for the payment to the beneficiary of the sum of $6,000 upon the death of the insured "by accident as defined in said policy," and further provides for the payment of certain specified "special disability benefits;" but neither the death benefit, nor the accident benefit, nor the "special disability benefits" are involved in the present controversy.

Plaintiff is suing in this case to recover $3,000 for an alleged "total and permanent disability," and is basing his action upon certain stipulations of the insurance contract contained in the "certificate" issued to him by the defendant, which stipulations are as follows:

"If the said employee, while less than sixty years of age, and while the insurance on the life of said employee under said policy is in full force and effect, shall become totally and permanently disabled or physically or mentally incapacitated to such an extent that he or she by reason of such disability or incapacity is rendered wholly, continuously and permanently unable to perform any work for any kind of compensation of financial value during the remainder of his or her lifetime, the amount of insurance payable at death from natural causes will be paid to said employee in monthly installments during two years, the first installment to be payable immediately upon receipt by the Company of due proof of such disability or incapacity; in accordance with the provisions of said policy. The disability benefits will be granted subject to cessation, in accordance with the provisions of the policy, should such disability or incapacity prove to be temporary and not permanent."

The "total and permanent disability" provisions of the group policy are substantially the same as above quoted from the certificate.

The "provisions of the policy" for "cessation" of "disability benefits," to which reference is made in the above quoted stipulations of the certificate, are as follows:

"Proof of Continuance of Disability.—Notwithstanding the acceptance by the Company of proof of total and permanent disability, the said person, upon demand by the Company from time to time, for the purpose of verifying that such disability is actually permanent and not temporary, shall furnish due proof that he (or she) actually continues in the state of disability defined above. In case of failure to furnish such proof, no further proportional parts of the premium on account of said person's insurance shall be waived and no further monthly installments shall be paid on account of such disability, and any insurance on the life of said person then remaining under this Policy may continue to be renewed subject to the terms of the Policy but if the said person be no longer in the employ of the Employer or if this policy be no longer in force the said person may, in respect of such reduced amount, make use of the privilege set forth under the heading 'Provisions as to Employee's Certificate and Conversion of Individual Insurance.' "

However, the provision for "cessation" of disability benefits just quoted does not affect the issues in this case. Conley v. Pacific Mutual Life Insurance Company, 8 Tenn. App., 405, 413; Metropolitan Life Insurance Company v. Noe, 161 Tenn., 335, 31 S. W. (2d), 689; Metropolitan Life Insurance Company v. Blue, 222 Ala., 665, 133 So., 707, 79 A. L. R., 852, 857.

At the close of the plaintiff's evidence in chief below, the defendant moved the court to peremptorily instruct the jury to return a verdict in favor of the defendant upon the following grounds, to-wit:

"First—There is no evidence which would support a verdict in favor of the plaintiff and against the defendant.

"Second—The plaintiff is able to engage in an occupation and/or perform work for compensation of financial value.

"Third—All of the testimony shows that the plaintiff has since the cancellation of the policy sued on and since the alleged disability, performed work for compensation of financial value.

"Fourth—There is no evidence showing that the plaintiff, while the contract sued on was in force, became totally and permanently disabled or physically or mentally incapacitated to such an extent that he by reason of such disability or incapacity is rendered wholly, continuously and permanently unable to perform any work for any kind of compensation of any financial value for the remainder of his lifetime."

The trial court overruled the above motion for a directed verdict, with the following statement:

"There is some evidence to carry to the jury. I feel like there is just enough evidence to carry it to the jury. Of course, I see Mr. Davis walking around here and I know exactly how you gentlemen feel about it; but those are matters the jury will have to pass on."

The motion was renewed at the close of all the evidence, and was then overruled by the court without comment. The motion for a new trial, made after the verdict of the jury (which latter motion was based, in part, upon the overrulement of the motion for peremptory instructions), was also overruled without comment by the trial judge.

The determinative question for decision here is whether there was material evidence before the jury from which it could be found that, as a result of his aforesaid injury on February 7, 1931, plaintiff is totally and permanently disabled or physically incapacitated to such an extent that, by reason of such disability or incapacity, he is rendered wholly, continuously, and permanently unable to perform any kind of work for any kind of compensation of financial value during the remainder of his lifetime.

Plaintiff testified that, immediately after he was injured on February 7, 1931, he was taken to the Appalachian Hospital at Johnson City, where he remained for five weeks; that he then returned to his home (at Erwin), where he was confined to his bed for "a month or two," after which he went around on a crutch for three or four months and then on a cane for a while; that, eight or ten months, or maybe a year, after he was injured, he went to the Rutherfordton Hospital, at Rutherfordton, North Carolina, for examination, but did not go there for treatment.

With reference to his condition (at the time he testified at the trial), plaintiff said:

"I can walk something like a mile and my leg gives out, and I have to drag it along; and when I go to bed at night, lots of nights I have to get my foot against the foot-board to get easy and go to sleep. It never fails to hurt me; it is hurting right now; there is a dead ache there right now, an old dead ache all the time."

Plaintiff stated further that he had tried to work; that he had tried to do everything else that anybody else can do; that he had "even tried to plow and hoe in the garden." Plaintiff admitted, on cross-examination, that he goes about town practically every day "just like any ordinary man;" that some days he can get around better than others; that he limps all the time; and that he cannot bend over to tie his shoe.

Before his injury, plaintiff's work was confined to farming and railroading. He worked on the farm until he was twenty-six or twenty-seven years of age, when he began work as a railroad brakeman and continued in that work until he was injured as before stated.

Plaintiff testified that since his injury he could not do railroad work

nor farm work; that he "solicited insurance" for two or three months, but "did not sell any;" that he had not earned "a dollar" nor "a penny" since he was injured; that he had owned two automobiles since his injury, in which he sometimes drove his friends around town, but that he "never charged anybody a penny;" that he drove Mr. B. U. Bolton ("special agent" for the Clinchfield Railroad Company) from Erwin to Jonesboro several times, and also to Bristol, Kingsport, and Gate City, but that he "did not charge him a penny;" that he told Bolton, if he would furnish the gas and oil, that was all he (plaintiff) wanted; that Bolton "probably" gave him $6 or $7 the whole time, but he made no charge, and Bolton gave it to him "more out of pity sake than anything else" and because he was sorry for him. Plaintiff admitted that, while operating his car after he was injured, he changed tires from time to time.

In this connection, it may be stated that B. U. Bolton, "special agent" for the Clinchfield Railroad Company and living at Erwin, testified, as a witness for defendant, that, on several occasions, in the latter part of 1931 and in 1932, he had employed Davis to drive him, in plaintiff's automobile, to Johnson City, Jonesboro, Gate City, Kingsport, and Okalona; that he made no contract with plaintiff as to the amount he would pay him for any of these trips; that plaintiff said he would leave it to him (Bolton) to give him "whatever he wanted to;" that he employed plaintiff because "he had a car and needed the work and rendered the service and was much cheaper than a taxi;" that he had known plaintiff since plaintiff began working for the railroad; and that plaintiff's brother married his (Bolton's) daughter.

The witness Bolton exhibited four receipts signed by plaintiff, ranging in date from January 15, 1932, to May 16, 1932, and aggregating $15.15, for "auto hire." The witness stated that these receipts sometimes included money that he advanced to plaintiff for the purchase of gas and oil used on the trips; that he never took a receipt when the amount paid for a trip was less than $2; that there were some trips made in 1931, but that receipts for 1931 were filed away in the railroad company's file and that they (the office employees of the Railroad Company) said that it was "too troublesome to look them up;" hence witness could not state what he paid plaintiff in 1931.

Mr. Bolton also stated that, on one of the trips mentioned in his testimony, a tire blew out and plaintiff "jacked up the car and either changed tires or wheels," and that witness did not remember that plaintiff made any complaint of suffering any pain in doing so; that plaintiff drove the car in a satisfactory manner, but that, while driving, plaintiff "stayed in one position all the time and different from an ordinary driver," in that, he always sat "a little this way or a little this way (indicating);" that witness did not know

which way, but he believed it was facing him, and he was on plaintiff's right.

Paul Booher, a witness for plaintiff, who lived near plaintiff and had known him for fifteen years, testified that plaintiff "could not drive a car to do any good;" that one day "about a year' before the trial below" witness was riding with plaintiff, and "all of a sudden" the car started down over a bank and witness "grabbed the steering wheel and got it stopped in time and got plaintiff out;" that plaintiff was "just as white as he could be," and witness put plaintiff back in the other side of the car and drove him home.

Booher also stated that he had seen plaintiff "try to work in his garden and maybe he would work five minutes or ten, something like that, and then go and sit down and rest."

Stanley Davis, a brother of plaintiff, testified, as a witness for plaintiff, that he lived in the same house with plaintiff, and that plaintiff "limps—that he cannot walk without limping."

Two physicians were examined as medical witnesses for plaintiff, viz., Dr. J. R. Moody and Dr. W. G. Preas. Dr. Moody, a practicing physician for nine years at Erwin, Tennessee, whose "qualifications" were "admitted," had examined plaintiff in the latter part of 1931 for the purpose of filling out "an insurance blank," and had examined plaintiff several times since. He stated that he found that plaintiff had "an injured pelvis and limitation of motion in the right side" that affects his locomotion and impedes his "action in walking, climbing and work of that nature;" that plaintiff's "pelvis bone . . . is in an abnormal condition resulting from the injury;" that witness had examined the X-ray picture of plaintiff, and that the injured pelvis bone is out of alignment with the uninjured one; that his right side is higher; that there is "a protrusion of the bony framework;" that witness did not think that plaintiff is physically able to do the work of a railroad brakeman; and that he is of the opinion that plaintiff's injury is permanent. Dr. Moody pointed out to the court and jury (on the naked person of the plaintiff) the "mis-alignment" which he had described.

On cross-examination, Dr. Moody states that he does not think there is any doubt that plaintiff will not be able to work as a trainman or brakeman; that he does not think there is anything in the present condition of plaintiff, from a physical standpoint, that would prevent him from working as an insurance agent or from clerking in a grocery store or clothing store, "unless he got an ailment that the injury might cause;" that plaintiff would probably be able to do such work as "sitting in a store, or buying or selling;" but that he does not know what plaintiff's qualifications are.

Dr. W. G. Preas, of Johnson City, graduated from the Medical Department of the University of Virginia in 1929, and has been practicing as a physician since that time. He examined plaintiff

shortly before he (Dr. Preas) testified at the trial below, and on the same day.

Dr. Preas states that plaintiff shows the result of having suffered from "trauma to the hip joint;" that plaintiff is disabled in his right leg; that plaintiff is unable to move his leg except in certain positions and without a certain amount of pain, and is unable to tie his shoe strings at all, as he cannot lean down to touch his feet; that plaintiff is physically in other ways in pretty fair shape and has pretty good weight, but that "in his right leg there is an atrophy somewhat, and his leg is fixed in a certain position" which "disables him to a very great degree;" that his right leg is shorter than his left leg, about an inch shorter, and there is evidence of an old fracture of the ilium, mostly the pelvis bone of the ilium, and "on there is a small spur of bone that seems to be penetrating continuously, the deeper tissues are very tender and that bothers the patient a great deal;" that this condition "will probably remain about the same or it may get worse; it may form a cancerous formation."

Dr. Preas stated further that plaintiff "couldn't even attempt to do brakeman's work at all; he just couldn't do it;" that he does not know any manual labor plaintiff could do; that "he might buy and sell pencils or do some sort of clerical work that way," but that he does not know whether plaintiff is trained for that kind of work or not—does not know how much education plaintiff has.

The defendant introduced and examined four medical witnesses in its behalf, viz., Dr. F. B. Stuart, Dr. John L. Hankins, Dr. E. T. Brading, and Dr. R. E. Stack.

Dr. F. B. Stuart, of Jonesboro, has been practicing medicine about twenty years. His "qualifications" were "admitted." In March or April preceding the trial in August (1933), he, in company with Dr. Brading, made a general physical examination of the plaintiff. He had also seen an X-ray plate showing the condition of "the pelvis region" of the plaintiff, which X-ray was present and identified by the witness when he testified.

Dr. Stuart testified that there was no pain or pressure at the site of the fracture and that plaintiff "did not allege any pain at the time;" that the only impediment in plaintiff's locomotion would be that of "abduction" (movement sideways) caused by a bone "that sticks out on the hip," which the witness described as a "spicular bone;" that plaintiff walked forward and backward "in a very normal fashion," and that there was nothing that impeded the backward and forward motion; that there was a good union of the fracture, and plaintiff's right leg is a useful member; that the removal of the spicular bone by an operation "would end the difficulty with reference to abduction;" that such an operation is considered a minor operation, for the reason that you do not enter into any serious cavity of the body; although he would have to take a local anesthetic,

which is not considered major at this time; that there is no contraction in the limb, and the supporting structure of the body is as strong as it ever was; that the witness could find nothing in plaintiff's condition that should prevent him from doing ordinary manual labor, or prevent plaintiff from pursuing any ordinary occupation not fraught with extra hazard and not requiring a high degree of agility; and that, in his opinion, plaintiff could engage in the occupation of a farmer, or taxi driver, or running a store or a filling station.

Dr. John L. Hankins, a practicing physician, doing X-ray work in connection with the Appalachian Hospital at Johnson City, identified an X-ray picture made by him of plaintiff's pelvis, and stated that he found a fracture of the wing of the right ilium, which (he explained) is "the hip bone, just below the soft part of the belly."

Dr. Hankins stated further that he later X-rayed plaintiff and found a union at the place of the fracture; that the fracture "did not hurt the supporting structure of the bony skeleton;" that there is none of the fractured bone that is detached from the unit of the pelvis; that he would think there is some work that plaintiff could do, but he don't know whether he could do work that "would require him to throw his hip out from his body" (which, the witness explained, was "abduction"); that he did not think that plaintiff's condition would prevent him from doing "sedentary work that did not require any special agility;" that he did not see anything that would interfere with the forward and backward movements of plaintiff's leg; that he thinks that if plaintiff has to sit in a "peculiar position" in an automobile, it is caused by "this spicular bone;" that if sitting in "one position all day on a long trip" in an automobile tires him, "he is not in much shape to do that," and if it is true that when plaintiff undertakes to work in a garden he has to sit down and rest after working five or ten minutes, witness does not think "he would be able to perform that."

Dr. E. T. Brading (a graduate of Harvard Medical School, with a year of general hospital work and three and one-half years at Mayo Clinic, practicing since 1927 and specializing in "diagnosis and medicine") testified that he examined plaintiff in March (1933) and had since seen an X-ray picture of plaintiff's "pelvis region;" that, from his examination of plaintiff and of the X-ray picture, he found that plaintiff "had suffered a common fracture of the ilium, that is the large supporting bone of the pelvis;" that "the bone apparently had been pretty well shattered, without a great deal of misplacement;" that "the bone had healed and knit together" and had made "a good union;" that the supporting skeleton of the pelvis had healed and was not impaired in any way; that "it is practically as strong as it ever was;" that "he has a spicular bone sticking out just above the point of the opening;" that plaintiff is not "impeded in walking," but the spicular bone might possibly

impede what is called "abduction;" that witness saw plaintiff walk across the street and go in the house and sit down in a chair and witness did not notice any "limp;" that witness examined for atrophy of the muscles, but found "none at all;" that there is a slight lowering of one ilium, about an inch, but this is not such an injury as would be calculated to keep a man from walking and transacting the ordinary business of life; and that witness did not see anything about plaintiff's physical condition that would prevent him from farming or carrying on any ordinary occupation which did not require special agility or work peculiarly hazardous.

Dr. R. E. Stack, the local surgeon of the Clinchfield Railroad Company at Erwin (and whose "qualifications" were "admitted"), testified that he was called to see plaintiff on the night plaintiff fell off of the top of a box car; that he found that there was some fractured bone and he sent plaintiff to the hospital at Johnson City, and later went to the hospital and examined him again; that he had seen an X-ray picture of plaintiff's pelvis, which shows "a union at the site of the fracture;" that he would say that since the union of the fracture plaintiff's pelvis is, functionally, as strong as it ever was; that "there is a spicular bone that protrudes from the lower angle of the ilium that would press in the soft tissues, that is on the side;" that the spicular bone "slides from one end to the other, when one part moves it all moves;" that witness would say that plaintiff is capable of engaging in ordinary work, such as clerking in a store, soliciting insurance, or any ordinary work that does not require extreme agility; that there is no doubt in his mind that plaintiff could do those "unhazardous kinds of work;" that with reference to plaintiff's ability to stoop over and tie his shoes and things of that kind, he would not have perfectly free motion like an ordinary man; that outside of railroad work, plaintiff is capable of doing most any kind of ordinary work.

The foregoing is, we think, a fair statement of the substance of all the evidence admitted to the jury.

Repeating, in substance, a statement hereinbefore made: The determinative question for decision on this appeal is whether there is material evidence from which the jury could find that plaintiff is totally and permanently disabled, or incapacitated to such an extent that he is, by reason of such disability or incapacity, rendered wholly, continuously, and permanently unable to perform any work for any kind of compensation of financial value during the remainder of his lifetime.

It is unquestioned that plaintiff is not entitled to an affirmance of the judgment unless there is material evidence that he became totally disabled while the policy in question was in effect, and that such total disability is permanent.

Under the contract on which plaintiff is suing, proof that

plaintiff is totally disabled from the prosecution of his usual employment as a railroad brakeman is not sufficient. His disability must be such as to render him wholly and continuously unable to perform any work for any kind of compensation of financial value.

In the case of Buckner v. Jefferson Standard Life Insurance Company, 172 N. C., 762, 90 S. E., 897, it was held that "a provision in an insurance policy that the insurer will pay a certain sum when the insured has become wholly disabled by bodily injuries and permanently, continuously, and wholly prevented thereby from pursuing any and all gainful occupations, will be construed as expressed, and the liability of the insurer thereunder will not be extended so as to include a total disability of the insured to perform his trade or vocation when other gainful occupations are still open to him."

And in the case of Parten v. Jefferson Standard Life Insurance Company, 30 Ga. App., 245, 117 S. E., 772, it was held that, although the insured, by the loss of a leg, might be totally disabled from performing his usual occupation, he was not wholly prevented from pursuing "any and all occupations" within the meaning of a policy provision of the same tenor and effect as that involved in the case of Buckner v. Jefferson Standard Life Insurance Company.

In Metropolitan Life Insurance Company v. Wann (Tex. Civ. App.), 28 S. W. (2d), 196, 198, the applicable provision of the policy was that the insured "must be wholly disabled and prevented from performing any and every kind of duty pertaining to his occupation." In the opinion, the court said:

"The evidence was that the plaintiff was a man 39 years of age; that he had been doing railroad work since he was 14 years of age; that he knew no other work; and that he could not get employment as a brakeman or other railroad employee connected with the movement of trains with his left hand stiff and useless. The record shows that since his injury his wife and father-in-law had bought a farm in the eastern part of Tarrant county and that they were managing it. That he drove a Hudson car with his right hand. That they had 41 acres in the farm and raised chickens and fruit. That during the fruit packing season they employed sometimes two or three other people to help gather the fruit; that he looked after that. That since quitting the railroad business he had not tried to get employment in any other line. That they had eight cows on the farm and he had tried milking one of them with more or less success. That he could do anything that a man with one hand could do if he knew how. That if he had a position as salesman requiring him to use an automobile and drive to and fro selling articles or taking orders, or taking orders for anything that wholesale houses had to sell, he believed he could do that. That he used the English language very well, though he had only gone through the fourth grade at school.

"Appellant urges that it is not shown that he is totally and per-

manently disabled, though the testimony of the doctors would support the finding of the jury that he was permanently disabled."

Then, after reviewing authorities, the court said:

"The evidence showed that the plaintiff had not tried to get any other kind of work than that of railroading since his injury, and we think that it is undoubtedly true that an able-bodied man whose ability to work is not impaired except from a disabled wrist and hand could find an abundance of work to do by means of which he could earn compensation. Therefore, we are constrained to hold that the plaintiff below did not make out his case by proof that he was totally, continuously, and permanently disabled from performing any work for compensation."

Judgment for plaintiff was reversed and suit dismissed.

See, also, Hurley v. Bankers' Life Company, 198 Iowa, 1129, 199 N. W., 343, 37 A. L. R., 146, in which the court contrasted two lines of cases defining "total disability," and (seemingly under the doctrine of stare decisis) denied liability of the insurance company in that case, but conceded that this ruling was contrary to the majority rule in other jurisdictions.

Many adjudications by the courts of the country with respect to the question as to what constitutes total disability, or total and continuous disability, or total and permanent disability, are cited and digested in annotations as follows: 24 A. L. R., 203, 37 A. L. R., 151, 41 A. L. R., 1376, 51 A. L. R., 1048, 55 A. L. R., 1255, 79 A. L. R., 857.

There are so many variations in the provisions of the insurance contracts and the facts involved in the numerous cases cited in the annotations above mentioned that an attempt to review them here would not only extend this opinion beyond all reasonable bounds, but would serve no useful purpose.

However, in the examination of authorities it will be observed that the provision for "total and permanent disability," in the contract here in question is governed by the same rules as similar provisions in accident policies, and cases involving the latter class of contracts are, therefore, applicable.

"The term 'total disability' is a relative term, depending in a measure upon the character of the occupation and the capabilities of the insured, and to a large extent upon the circumstances of the particular case." Metropolitan Life Insurance Company v. Blue, 222 Ala., 665, 133 So., 707, 709, 79 A. L. R., 852, 855; 6 Cooley's Briefs on Insurance (2 Ed.), p. 5539.

Hence, it was held, in a case where the policy provided that the insured must be disabled "from doing or performing any work, labor, business, or service, or any part thereof," that if the insured (an uneducated day laborer) was disabled to do such work as, considering his ordinary employment, qualifications for affairs, and stand-

ing in life, could have been expected of him, he was totally disabled within the meaning of the policy, and should recover. Industrial Mutual Indemnity Company v. Hawkins, 94 Ark., 417, 127 S. W., 457, 29 L. R. A. (N. S.), 635, 21 Ann. Cas., 1029 (cited in 6 Cooley's Briefs, page 5546).

However, the contract of defendant insuring plaintiff against "total and permanent disability" is not one of indemnity against loss of income, but against loss of ability or capacity "to perform any work for any kind of compensation of financial value." 6 Cooley's Briefs, pp. 5536, 5537.

In the case of Maresh v. Peoria Life Insurance Company, 133 Kan., 191, 299 Pac., 934, 936, where the policy provided for indemnity in case of injury or disease such as to prevent the insured then and at all times thereafter from performing any work or conducting any business for compensation or profit, it is said:

"The court regards the policy as one designed to provide a substitute for earnings when the insured is deprived of capacity to earn by bodily injury or disease. He must be prevented from performing work and conducting business for compensation or profit. Interpreting the policy in the light of its purpose, the words 'performing any work' mean engaging in any gainful occupation or employment in the customary manner as a workman. The words 'conducting any business' mean managing, directing, controlling, or carrying on habitually any gainful enterprise involving transactions, dealings, and the like, as distinguished from work as just defined. The words 'for compensation or profit' mean remuneration for effort expended in performance of work or conduct of business. The definitions contemplate the substantial doing of those things which are generally regarded as constituting performance of work and conduct of business, and not simply the sporadic doing of simple tasks, or the giving attention to simple details, incident to performance of work or conduct of business. The definitions also contemplate that compensation shall be in a fair sense remunerative, and not merely nominal. Of course a business conducted for profit may in fact not yield a profit, but the business contemplated is business conducted for profit in a remunerative sense."

The cases of Prudential Insurance Company of America v. Wolfe (C. C. A., 1931), 52 F. (2d), 537, and Horn's Administrator v. Prudential Insurance Company of America, 252 Ky., 137, 65 S. W. (2d), 1017, 1019, were actions upon "total and permanent disability" provisions of group insurance policies, which provisions were phrased in identically the same words as the policy provisions upon which the present action is based. In the first of the two cases just mentioned, the plaintiff, Wolfe, obtained the verdict of a jury and judgment thereon against defendant insurance company in the trial court, but the Court of Appeals reversed the judgment, holding

that the motion of the defendant insurance company for a directed verdict should have been sustained.

In the Kentucky case of Horn's Administrator v. Prudential Ins. Co. of America, the trial court directed a verdict for the defendant insurance company at the conclusion of the evidence, but the Court of Appeals held that "the evidence was sufficient to authorize the submission of the question of permanent and total disability according to the conditions of the policy" to the jury, and reversed the judgment and remanded the case, because of the error in directing a verdict and other errors in the exclusion of evidence.

We do not regard either the Wolfe case or the Horn case, supra, as a precedent of persuasive authority in the instant case, for the reason that the facts of neither of the two cases are even approximately parallel to the facts of the instant case. We think it apparent that, in the Wolfe case, the Federal Court of Appeals was inclined to the strict or literal interpretation of the policy contract, and, in the Horn case, the Kentucky Court of Appeals was inclined to a more liberal interpretation, and, in this aspect, each of these cases is supported by a divergent line of adjudged cases, as pointed out by the Iowa Supreme Court in the case of Hurley v. Bankers' Life Company, supra.

The opinion of our Supreme Court in the case of Pacific Mutual Life Insurance Company v. McCrary, 161 Tenn., 389, 32 S. W. (2d), 1052, 1053, seems to align Tennessee with the jurisdictions adopting the "liberal rule."

The McCrary case, supra, was based on a policy insuring against "total disability" in terms quite similar in purport and effect (although not expressed in the same phraseology) to the policy provisions here involved, and in the McCrary case the Supreme Court defined "total disability" as follows:

"The phrase 'total disability' has a well-understood meaning in the law of insurance. It does not mean a state of absolute helplessness. The decisions, almost without conflict, define that condition as an inability to do the material acts necessary to the prosecution of insured's business or occupation (and substantially all the material acts) in (substantially) his usual or customary manner. Cases so holding are too numerous to be set out. They are cited and quoted in 14 R. C. L., 1315; 1 C. J., 462; and notes, 51 A. L. R., 1048, 41 A. L. R., 1376, 37 A. L. R., 151, 24 A. L. R., 203.

"One may still be described as totally disabled, although he is able at intervals to perform certain acts in connection with the former occupation or calling that he pursued. Such is the condition of the plaintiff.

"Thus it is, under the authorities, the insured here may be characterized as totally disabled, unless those words are so limited by other language of the policy before us as to repel this conclusion.

We do not think the words of the policy, relied on by the insurance company, have such an effect, nor that total disability is so defined by the policy as to exclude the insured from its benefits. The clause of the policy quoted merely provides, in order for an insured to claim these benefits, that he must be totally and permanently prevented 'from performing any work . . . for wages, compensation or profit' or 'engaging in any occupation or profession for wages, compensation or profit.' In short, the insured, to claim the benefits, must be disabled, not only from pursuing the avocation of physician or farmer, but must be disabled from pursuing any avocation for wages, compensation or profit. . . .

"We cannot agree to the contention of learned counsel for the insurance company that the definition of total permanent disability in this policy implies an absolute and entire lack of earning power on the part of the insured. Such a condition would be one of complete inertia, mental and physical, and we do not think such condition was contemplated in the contract of insurance as a prerequisite to recover for permanent total disability."

The reasons given by the court for its ruling in Pacific Mutual Life Insurance Company v. McCrary, supra, are elaborated somewhat in Foglesong v. Modern Brotherhood of America, 121 Mo. App., 548, 97 S. W., 240, 241, as follows.

"Common knowledge of the occupations in the lives of men and women teach us that there is scarcely any kind of disability that prevents them from following some vocation or other, except in cases of complete mental inertia. We have examples of persons without hearing and without sight following a vocation—some without feet, and some without hands, engaged in business. The achievements of disabled persons are seemingly marvelous. Under defendant's theory, the plaintiff might embark in the peanut trade or follow the business of selling shoestrings or lead pencils, or follow some similar calling; in which instances, under the rule invoked, there would be no disability within the meaning of the policy. In our opinion, such was not within the contemplation of the parties. In order to carry out the intent of the parties, it is our duty to disregard the broad language used which would have the effect to defeat the purpose of the contract and render it a nullity. It has been said that: 'The policy is the law by which the mutual rights and liabilities of the parties are to be measured, and should be construed strictly against the insurer, where they narrow the range and force of the allegation or provide for forfeiture.' Renn v. Supreme Lodge K. of P., 83 Mo. App., 442; Hale v. Ins. Co., 46 Mo. App., 508."

The extent of a claimed disability—whether it is "total" and/or "permanent"—is ordinarily a question for the jury. 6

Cooley's Briefs on Insurance, p. 5614; Metropolitan Life Insurance Co. v. Blue, 222 Ala., 665, 133 So., 707, 79 A. L. R., 855, supra.

In Metropolitan Life Insurance Company v. Noe, supra, the court said:

"In insurance parlance the phrase 'totally and permanently disabled' contemplates a physical condition at the time of the claim which reasonably convinces the judging authorities that (a) the subject is then totally disabled, and (b) will so remain for life. These are issues of fact to be determined on the evidence adduced in each individual case. The jury or judge may look to the physical appearance of the claimant and the history of the case, and consider lay and expert testimony and determine whether (a) the disability is total, that is, incapacitating the claimant for any remunerative occupation; and (b) whether it will be permanent, that is, lasting or continuous, as distinguished from temporary merely, with a promise or affording a probability of recovery."

With respect to the issue of "total disability:" It is quite clear that, as a result of his injury on February 7, 1931, plaintiff immediately became, and was thereafter for several months in the year of 1931, totally disabled or physically incapacitated to perform any work for any kind of compensation of financial value; but, as we have seen from the testimony of the witnesses hereinbefore narrated, there is much persuasive evidence that he was not thus disabled or incapacitated during at least a part of the year 1932 and thereafter down to, and at, the trial below in August, 1933. The undisputed proof shows that, at the trial and for more than a year theretofore, he was by no means in a state of "absolute helplessness."

But, in the consideration of defendant's motion for a directed verdict and in ascertaining whether there is any evidence to support the verdict of the jury in plaintiff's favor, the plaintiff must be given the benefit of all evidence that was adduced in his behalf and all evidence favorable to him introduced by defendant; and all evidence in conflict therewith must be disregarded.

Moreover, the plaintiff is entitled to all legitimate inferences of fact favorable to him which may be reasonably drawn from the evidence tending to support the cause of action stated in his declaration. These rules are too well established to need any citation of authority.

However, the "scintilla rule," as generally understood, does not prevail in Tennessee; but "when there is some evidence of a material or substantial nature to support the plaintiff's case, the court will not undertake to determine its comparative value or weight, but will leave the determination of the conflict to the jury." Brenizer v. Railway; 156 Tenn., 479, 484, 3 S. W. (2d), 1053, 1054, 8 S. W. (2d), 1099. And evidence of "a material or substantial nature" is more than a "mere dogmatic assertion, which does not appeal to

the reason of the court, which does not have substance and relevant consequence," and "which does not have fitness to induce conviction." Fitch v. American Trust Company, 4 Tenn. App., 87, 94.

█ The test of plaintiff's claim of "total disability" is not whether he has earned anything of substantial financial value since he was injured, but whether he is deprived by bodily injury or disease, of the physical capacity to do the work necessary to the pursuit of any gainful occupation for which he is otherwise qualified. There is no evidence, and no claim, that plaintiff's mental faculties are, or have been, impaired.

It appears, without dispute, that plaintiff's general health is good. There is no claim that he is afflicted with any organic disease. His sole claim is that the condition of his right hip constitutes a total disability. There has been a union of the fractured ilium, and the "supporting structure" of the pelvis is now as strong as before the plaintiff's injury. The right hip bone is slightly higher than the other, but this does not impede his locomotion. He can walk forward or backward like "any ordinary man." It is only in the matter of "bending over" (such, for example, as to tie his shoes), and in "abduction" (the lateral movement of his right leg), that he is handicapped.

We think it is a reasonable inference from undisputed testimony of the medical witnesses that whatever of pain plaintiff still suffers is due to the "spicular bone" mentioned in their testimony. Dr. Preas, plaintiff's witness, describes it as "a small spur of bone that seems to be penetrating continuously" and "bothers the patient a great deal," as "the deeper tissues are very tender."

Dr. Stuart states that plaintiff's impediment in abduction is caused by the "spicular bone," which (from the definitions of "spicule" and "spicular" in Webster's International Dictionary) we understand is a minute, slender, pointed, needle-like bone. And, as before stated, Dr. Stuart testified that the spicular bone in question could be removed by a minor surgical operation, and, he said, that "would end the difficulty with reference to abduction."

Of course, if whatever pain plaintiff suffers in his hip is caused by the presence of the "small spur of bone," its removal will relieve such pain.

Whether, under the ruling in the McCrary case, supra, and cases in accord, there is or not some evidence to support a finding that plaintiff, in his present condition, is totally disabled, the motion for peremptory instructions should have been sustained if there is undisputed evidence that such disability is not permanent; and it is insisted for defendant that "the insured has the burden of making out a case of permanent, total disability, and that he fails to do so where the testimony shows that if there be a minor, non-dangerous operation he will not be so disabled." It is the general rule in tort

actions and workmen's compensation cases that the claimant must act reasonably to minimize the disability. Although such cases are not directly in point here, the principle involved is in some respects analogous.

In tort actions, "If the plaintiff omit to use his opportunities, and does not reasonably exert himself to lessen the damages which may result from the defendant's act, he is not entitled to compensation for the injury which he might and ought to have prevented, except to the extent of proper compensation for such measures or acts of prevention as the case required and were within his knowledge and power." 1 Sutherland on Damages, p. 238.

Applying the rule just stated, the court held in Leitzel v. Del., etc., R. Co., 232 Pa., 475, 81 Atl., 543, 48 L. R. A. (N. S.), 114, that if the otherwise permanent effect of a personal injury can be relieved by a simple surgical operation which an ordinarily prudent man should undergo, that fact should be taken into consideration in awarding damages, as tending to show the actual damages sustained.

Other cases in which similar rulings were made are cited in Cody v. John Hancock Mutual Life Insurance Company, 111 W. Va., 518, 163 S. E., 4, 86 A. L. R., 354.

Under the Tennessee Workmen's Compensation Act (Code 1932, sec. 6851 et seq.), a claimant is not entitled to recover compensation so long as he declines to submit to a simple, nondangerous operation, under a local anesthetic, demanded by his employer. Sun Coal Co. v. Wilson, 147 Tenn., 118, 245 S. W., 547. It is proper to say, however, that the ruling just stated rests, in large measure, upon provisions of the Workmen's Compensation Act requiring the employer to furnish medical and surgical treatment to his injured employee, and requiring the employee to accept such treatment (Code 1932, sec. 6875).

The ruling in Sun Coal Co. v. Wilson, supra, is in accord with the general current of authority. See Annotations, 6 A. L. R., 1260, 18 A. L. R., 431, 73 A. L. R., 1303.

The case of Cody v. John Hancock Mutual Life Insurance Company, supra, was an action on a total disability and waiver of premium clause of a life insurance policy. There was no provision in the policy for the payment of permanent disability benefits, but merely for eight months' total disability benefits. The court in that case said that upon the undisputed facts, plaintiff was, as a matter of law, precluded from recovering of the insurer for total disability subsequent to a time when it could have been reasonably expected that his condition would have been substantially improved had he submitted to a simple, nondangerous surgical operation advised by his physician.

The case of Cody v. John Hancock Mutual Life Insurance Com-

pany is annotated in 86 A. L. R., pages 360, 361; the subject of the Annotation being, ''Failure or refusal of insured to submit to corrective surgical or medical treatment as affecting right to recover insurance benefits.''

In addition to the Cody case, supra, the annotator cited only three cases, viz.: Liberty Life Insurance Society v. Downs (Miss.), 112 So., 484; Maresh v. Peoria Life Insurance Company, 133 Kan., 191, 299 Pac., 934, 936, supra, and Tittsworth v. Ohio National Life Insurance Company, 6 Tenn. App., 206.

In Liberty Life Assurance Society v. Downs, supra, the plaintiff, Downs, obtained verdict and judgment in the trial court. On appeal, the only question was whether there was evidence sufficient to show that the insured was totally and permanently disabled. All that appears in the opinion with reference to a surgical operation is as follows:

''In the argument it is said that the appellee could have been cured by a simple operation, and that she was in duty bound to submit to such operation; that if she failed to do so she should not be allowed to recover.

''The court instructed the jury, at the instance of the defendant, 'That if plaintiff's disability can be removed by a surgical operation, which she is reasonably able to undergo and can undergo, then she is not permanently disabled or totally disabled, and you shall find for the defendant.'

''The proof in the record (the testimony of the physician who tended the appellee) showed it was doubtful whether appellee could withstand an operation—it was problematical, in his opinion.

''The policy gave the assurance company the right to demand an examination of the appellee, and the testimony of the physician who made the examination shows that he did not make a critical examination with reference to plaintiff's condition, and that he did not offer to perform an operation for her benefit.

''We think the proof warranted the jury's verdict, and the judgment of the court will be affirmed.''

It is not at all clear that, in the Maresh case, supra, the court so much as considered the question as to whether the disability was permanent, if it could be relieved by a minor surgical operation. Apparently the only evidence relating to an ''operation'' is contained in a single question and answer found in a lengthy quotation from the testimony of a surgeon, which question and answer are as follows:

''Q. Would you advise an operation? A. No, sir.''

There is nothing in the opinion of the court on the subject of the failure or refusal of the insured to submit to a surgical operation, unless it be inferred that the court had that in mind in making the following statement, viz.:

''Defendant requested an instruction to the effect it was the duty

of plaintiff to exercise every reasonable effort to aid recovery. The contract does not so provide. No doubt it is the moral duty of every person to make the most of himself under even the most adverse circumstances; but the issue in this case was whether plaintiff's disability was permanent.''

"But, as before stated, the only evidence in the Maresh case on the subject of a surgical operation was that such an operation was not advisable.

The case of Tittsworth v. Ohio National Life Insurance Co., supra, was decided by the Middle Section of this court as now composed, but the issue determined in that case does not arise on the record in the instant case.

In the opinion in the Tittsworth case, it is said:

"In this case the complainant seeks to recover upon a contract of insurance. This contract contains no provision, express or implied, that in case of injury or disability the insured will submit to a surgical operation. It is probably presumed that the insured, out of a motive of self-protection or self-preservation, would obtain such medical and surgical treatment as would be necessary; but this matter is left open in the contract. It is not the subject of any stipulation. It is a matter which the insured is left to determine for himself; and if he, through apprehension, or for any other cause, has determined that he will not submit himself to an operation, he is under no contractual obligation to do so. . . .

"Such requirement of a surgical operation, though a minor one and reasonable, under any circumstances, not being contained in the stipulations of the written contracts, the defendant insurance company is not entitled to take advantage of the failure or refusal of the insured to submit to such an operation."

But the language of an opinion is to be interpreted in the light of the facts and issues involved in the particular record there under investigation, and the principles announced are to be limited and restricted by the facts appearing in the case in judgment, and should not be extended beyond such facts for the purpose of authority in another and different case. German Alliance Insurance Co. v. Home Water Supply Co., 226 U. S., 220, 33 S. Ct., 32, 57 L. Ed., 195, 201, 42 L. R. A. (N. S.), 1000; Coffee v. Neely, 2 Heisk., 304, 313; Louisville & N. R. Co. v. County Court, 1 Sneed, 637, 695, 62 Am. Dec., 424; Clark v. Lary, 3 Sneed, 77, 80; State ex rel. v. Baseball Club, 127 Tenn., 292, 307, 154 S. W., 1151, Ann. Cas., 1914B, 1243; U. S. v. Eaton, 169 U. S., 331, 18 S. Ct., 374, 42 L. Ed., 767, 773; Wright v. Nagle, 101 U. S., 791, 25 L. Ed., 921, 923; Gaines v. Hennen, 24 How., 553, 16 L. Ed., 770, 774; Ogden v. Saunders, 12 Wheat., 213, 6 L. Ed., 606, 647.

It is, therefore, proper to examine the facts of the Tittsworth case

in order to ascertain the meaning and scope of the opinion of the court in that case.

Tittsworth was injured while two life insurance policies—one for $2,000 and the other for $3,000—previously issued to him by the Ohio National Life Insurance Company were in force. The insured suffered a fracture or dislocation of the coccyx, which is the last bone of the spinal column, formed by the union of four rudimentary or undeveloped vertebrae. Each of said policies was an endowment life insurance policy, nonparticipating, and maturing in thirty-nine years. Each policy also contained provisions for the payment of disability benefits of one per cent, per month of the amount insured under the policy during the lifetime of the insured or until the maturity of the policy as an endowment, upon "satisfactory proof" that the insured "has been so disabled by bodily injury or disease as presumably to be permanently, continuously and wholly prevented for life 'from pursuing any and all gainful occupation.' " It was further provided that on such satisfactory proof of disability the payment of further premiums by the insured would be waived by the company.

After his injury, Tittsworth furnished "proofs" of his injury and disability which were "satisfactory" to the insurer, and the insurer paid to the insured disability benefits under both policies for four months, in accordance with the aforesaid terms and stipulations of the policies.

However, each of the policies contained further provisions (immediately following the above-mentioned provisions for disability benefits) as follows:

" 'The company shall have the right to examine the person of the insured, at all reasonable times, after receiving notice of disability, and shall have the right from time to time, but not oftener than once a year, during the continuance of the monthly payments provided for herein, to demand and receive proof of continuance of disability.'

" 'Should the insured recover so as to be able to engage in any gainful occupation, the premiums thereafter falling due shall be paid by the insured in conformity with the policy, and the monthly payments, provided for herein shall cease. There shall however, be no obligation on the insured to repay the monthly payments already made or the premiums already waived hereunder.' "

After paying to the insured disability benefits for four months as aforesaid, the insurance company demanded and obtained "the right to examine the person of the insured," and he was accordingly examined by some physicians and surgeons of skill and experience, who advised that an operation for the removal of the bones of the coccyx, if properly performed with a local anesthetic, would remove the disability, restore the insured to health, and would not interfere with the muscles controlling the rectum; that although any operation is attended with some danger from infection, this danger would be

small in Tittsworth's case, if the operation be properly performed by a surgeon of skill and experience and under proper circumstances. Thereupon, the insurance company demanded that the insured submit to the operation thus advised by said physicians. The insured was advised by another physician not to have the operation performed, as it would cause a loss of control of the bowels, and that he would ultimately get well. The insured declined to have the operation performed and the insurer declined to pay any further monthly benefits; whereupon Tittsworth sued to recover the benefits accrued since the suspension of the monthly payment of benefits by the insurance company as aforesaid, and the company interposed, as a defense, the refusal of the insured to submit to the described surgical operation.

It was not claimed that there was any fraud or misrepresentation in the "proofs" which were furnished by Tittsworth in the first instance, and it is obvious that, after the acceptance of such "proofs" of disability as "satisfactory," and the payment of the stipulated disability benefits for four months, the insurance company could not escape the continuous monthly payment of such benefits "during the lifetime of the insured, or until the maturity of said policies as an endowment," in any manner other than through the rights reserved in the policies (as before quoted) "to examine the person of the insured at all reasonable times after receiving notice of disability" and "to demand and receive proof of continuance of disability" from time to time, but not oftener than once a year, during the continuance of the disability.

The rights thus reserved by the insurer were clearly defined in the policies, and did not include the right to demand that the insured should submit to a surgical operation. It does not appear that the company demanded of the insured "proof of continuance of disability" (and its right to make such demand in less than one year after the beginning of the payment of disability benefits is, to say the least, doubtful). The company demanded and obtained "the right to examine the person of the insured," and, upon such examination, it demanded that the insured submit to a surgical operation; but, as no right to require a surgical operation in the circumstances stated was reserved in the contract, the chancellor rendered a decree against the insurance company for the amount of the stipulated benefits from the date of the suspension of payments to the date of the decree, which decree was affirmed by this court, and certiorari was denied by the Supreme Court.

The issue in the instant case is quite different from that in the Tittsworth case. The present defendant insurance company declined to accept the "proofs" of disability furnished by plaintiff Davis for the reason that, as it claimed, they did not show total and permanent disability within the terms of the policy-contract, and

the company at no time acknowledged liability for disability benefits or made payments therefor. The question below was, therefore, whether there had been a breach of the defendant's contract to pay disability benefits as defined in the policy, and to establish such breach the burden was on the plaintiff to prove that his claimed disability was both total and permanent.

The testimony of Dr. Stuart, with respect to a surgical operation for the removal of plaintiff's disability was as follows:

"Q. If there is any impediment in his locomotion, in what direction is it and what causes it? A. The only impediment in his locomotion would be that of abduction; pushing his leg out in this fashion.

"Q. What is that caused by? A. It is caused by this bone right here.

"Q. The one that sticks out on the hip? A. Yes.

"Q. Is there anything about that spicular bone that is likely to impede his motion forward or backward? A. No, sir. At the time we examined him I saw him walk across the street, and he walked in a very normal fashion.

"Q. This spicular might cause some impediment in motion? A. That is right.

"Q. There was nothing you found that impeded the backward and forward movement? A. No, nothing in the pelvis as a result of the fracture, that in my opinion was the only trouble.

"Q. Does he or not have a good union there of the fracture? A. He does.

"Q. Is his right leg a useful member? A. It is.

"Q. Doctor, that bone, if that was removed what in your opinion would be his condition? A. That would end the difficulty with reference to abduction.

"Q. Could that be done by an operation? A. Yes.

"Q. Would that be considered a major operation or a minor operation; how is it defined? A. It is considered a minor operation, for the reason that you don't enter into any serious cavity of the body; although he would have to take a local anesthetic, which is not considered major at this time."

Cross-examination.

"Q. You spoke about an operation, and you spoke about whether it was minor or major. If I understand it, a major operation is anything that requires or you are supposed to take some anesthetic? A. An anesthetic is usually given in major operations, and it is also given in minor operations.

"Q. And in this operation he would probably be placed under an anesthetic? A. I should say so, yes.

"Q. Does that require special or ordinary— A. Just an ordinary anesthetic.

"Q. Did you ever operate on a patient of that kind? A. No, sir.

"Q. You do some work of that nature, don't you? A. Minor operations only.

"Q. Could they do that all right in some hospital around here? A. Yes, I should say so.

"Q. There is always more or less danger in an operation that involves an anesthetic, and more or less involved in a bone operation, is there not? A. I would say an anesthetic in this case and the nature of the operation with reference to infection would be very negligible.

"Q. There is always something of some trouble of that kind? A. This would just be a matter of going down and taking this bone out.

"Q. After all of that was done, he would still be a man that has some trouble? A. I should say not. I should say that would remove the difficulty. I think that is the only difficulty he has.

"Q. You think he would be as well off after he had the operation, if he would recover from it? A. So far as impaired motion is concerned, I should say so."

The above-quoted testimony of Dr. Stuart was undisputed. Plaintiff had the opportunity, and it was his privilege, to rebut said testimony of Dr. Stuart by showing, if such were the facts, that the operation would be dangerous or would not likely remove plaintiff's disability (Sun Coal Co. v. Wilson, supra, page 128 of 147 Tenn., 245 S. W., 547); but he made no offer of such evidence, and Dr. Stuart's testimony to the effect that the "spicular bone" may be removed from plaintiff's hip by a nondangerous, minor surgical operation, and that this will relieve such disability as plaintiff is now suffering, is uncontradicted in the record. There is nothing in the record which suggests to us that said undisputed testimony of Dr. Stuart is contrary to "reason and common sense" (Sun Coal Co. v. Wilson, supra, page 128 of 147 Tenn., 245 S. W., 547), and we think it is sufficient to show that the disability of which plaintiff complains was not and is not permanent. The defendant's motion for a directed verdict should, therefore, have been sustained by the trial court.

It results that defendant's assignments of error asserting (a) that there is no evidence to support the verdict of the jury, and (b) that the trial court erred in overruling defendant's motion for peremptory instructions to render a verdict in favor of the defendant, are sustained, and the judgment of the circuit court is reversed, the verdict of the jury is set aside, and the plaintiff's suit is dismissed.

The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff Wesley P. Davis and the surety on his cost bond in the circuit court. See Gulf Refining Co. v. Frazier, 15 Tenn. App., 662, 704.

Crownover and DeWitt, JJ., concur.